LEOPOLD METHUDY ET AL., Plaintiffs in Error, *v.* JOHN ROSS ET AL., Defendants in Error.

### March 15, 1881.

1. That a contract was to be subsequently reduced to writing is not proof that there was no final agreement between the parties.
2. When the agreement was to be reduced to writing, and there is no sufficient evidence from which its exact terms can be determined, it will be inferred that the understanding of the parties was that there was no contract until the terms were reduced to writing.
3. The giving of an ambiguous declaration of law in a trial before the court is not necessarily ground for a reversal.
4. In a trial before the court parties should ask declarations of law from which it can be determined what the court held as to the law, and what it found as to the facts.

ERROR to the St. Louis Circuit Court, BOYLE, J.

*Affirmed.*

D'ARCY & NAGEL, for the plaintiffs in error.

J. M. & C. H. KRUM and W. B. DOUGLAS, for the defendants in error.

BAKEWELL, J., delivered the opinion of the court.

This is an action for damages for breach of contract of sale of a lot of lumber. The cause was tried by the court without a jury, and the finding and judgment were for defendants.

The evidence showed that plaintiffs were lumber dealers in St. Louis; defendants were also lumber dealers, and one

Leahey was a person engaged in logging. On September 6, 1879, Leahey owned a large quantity, altogether about two million six hundred thousand feet, of lumber, at Wausau, Wisconsin, of which a part was in logs in the river at that place, marked with Leahey's mark, and part dry lumber in piles. Defendants had made advances to Leahey on this lumber, and had taken as security a bill of sale of the lumber and a cotemporaneous written contract. The bill of sale was filed in the lumber inspector's office at Wausau. The cotemporaneous instrument was not so filed. On September 6th, which was Saturday, Scott, one of defendants, Methudy, one of plaintiffs, and Leahey, were at Wausau. Scott's deposition was read by plaintiffs. Scott testifies that he had written to Methudy about some lumber belonging to one Beebe; that at the day last named Methudy came to him at Wausau and asked to look at the Beebe lumber. Scott found that this lumber was sold, and advised Methudy to buy the Leahey lumber, saying that Leahey was there, and that he had better make the price and terms with Leahey. Witness then introduced Leahey to Methudy, and left them together talking of the trade until train time. Witness was busy about other matters, and did not hear all the conversation. Methudy and Scott were going together for some miles on the railroad; and, as they were starting, it was stated to Scott that Leahey and Methudy had agreed upon the price, and that the details of the trade should be stated by Methudy to Scott on the cars. Scott understood that there was a conditional sale, provided Methudy could get transportation. Scott was to submit Methudy's proposition for terms of sale to Leahey on the next Monday night. On the train, Methudy made several propositions, as to which, Scott said that he thought they would not be accepted, as they were not equal to the purchase made of the Beebe lumber. At last Methudy made a proposition of which Scott took a memorandum, as follows: "Will pay, on each three hundred thousand as

shipped, one-half cash for each, balance in ninety days; January 15, 1880, on lumber in pile, $2,000 and ninety per cent of the balance; give notes payable May 15th and June 15th — with interest after April 15th, at ten per cent per annum." Scott was to draw the contract, if the trade was consummated, and to forward it to Methudy. On the 8th, Scott transmitted this proposition to Leahey. Leahey had possession of the lumber, and Scott represented to Methudy that he and Ross had an interest in the lumber for advances to Leahey. Methudy was to guarantee getting cars; and the whole details of the trade were to be settled by the contract to be written, subject to the conclusions of Leahey and Methudy.

Methudy swears that he did not know the lumber belonged to Leahey; that Leahey said very little during the conversation, though all three talked about the lumber; that the whole talk about the lumber ceased when Scott left; that Scott called it the Leahey lumber, but said he had a bill of sale of it; that Leahey said Scott had the selling of the lumber, and the terms must be made with him, and that he (Leahey) would consent to any terms made by Scott with Methudy, and that the proposition taken down by Scott on the cars was made by Scott, and taken down by Methudy, and that Scott said he would let Leahey know about it.

Scott says that he told Methudy, on leaving him, that he was going to be absent for eight days; that it would be useless to write to him; that he would submit the proposition to Leahey on Monday, and that Methudy should correspond with Leahey.

On Monday, the 8th, Scott wrote from Grand Rapids to Leahey, stating the terms as already set forth, and adding that Leahey is to take the chances of the cars, and will take the lumber on those terms if it can be shipped. On the same day Methudy sent a telegram from La Crosse to Leahey at Wausau : " I take lumber; have secured trans-

portation ;" and also dispatched to Scott at Grand Rapids : " I take Leahey's lumber ; have transportation ; push Warren."

Leahey received Scott's letter on the 9th, and wrote that he would accept no such terms ; that they were not the terms that Methudy and he had talked of and agreed to at Wausau, and directing Scott to notify Methudy of his refusal. He on the same day telegraphed Methudy & Meyer, at St. Louis : " Must have terms cash or notes with interest, and contract signed before shipping. Will you take lumber? Answer." Leahey swears that the terms on which he gave his refusal of the lumber to Methudy on the 6th, were that the payments should be cash, and notes secured so as to be equivalent to cash.

Methudy swears that the terms of the agreement were all settled in the cars between him and Scott, and that the only reason that the matter was not closed was that he was not then sure that he could get barges at La Crosse for the sawed lumber. It was the duty of the seller of the lumber, according to Methudy, to see to getting cars to transport the lumber one hundred and thirty miles to La Crosse, at which point it was to be taken to St. Louis by river in barges for the sawed lumber, and the logs in rafts ; but Scott says that Methudy was to guarantee cars to transport the lumber from Wausau to La Crosse. Both Scott and Methudy seem to have interested themselves in making arrangements with the railroad superintendent about cars.

On the 10th, Methudy replied by wire to Leahey's telegram : " Will stand interest ; lose no time in shipping ; send contract ; " and on the same day, Methudy wrote to Scott, saying that he accepted the proposition as to interest, because he had contracts for removing the lumber, and might, otherwise, be sued for breach of them. The letter goes on : " When I left Leahey he told me, anything that you arranged as to terms would be satisfactory to him. It is pretty evident he changed his mind, as you have as much

to do with the lumber as he. I expect he consulted you on the subject. The dispatch says nothing as to the rate of interest, and I take it for granted that it will be the same as in John Meyer's trade, six per cent, as any other rate, under the circumstances, would be unfair. I see no reason why shipment shall be delayed until contract is signed. Every day now is of importance, and should be made use of — unless he wants to put terms in it different from the original contract. I maintain that the trade was made with you, and you to write out the contract according to the memorandum which you took on the train. I have no doubt that you will see that what is right will be done. Leahey could never have sold me this lumber, as I know but little about him. I shall be home to-morrow. Answer soon, and hurry up shipments.''

On the 10th or 11th, Leahey sold the lumber in logs to one Meyer of St. Louis, at an advance upon the rates offered to Methudy ; and on the 13th, wrote to Methudy & Meyer, that they could still have the lumber in piles, on the original terms, cash and notes. There was evidence that at the date of the alleged breach, the market rate at Wausau was higher than the price named in the memorandum of Scott and Methudy.

There is a dispute between the parties as to what was the agreement about the deferred payments as to interest and as to security ; but there can be no question that one-half was to be paid cash for each three hundred thousand feet as it was delivered on their cars at Wausau ; this would make each cash payment $1,575. Were Methudy & Meyer to have at Wausau, at each period of delivery, cars enough to receive three hundred thousand feet of lumber? It hardly seems that this could be possible. It is said by appellant that it would be impossible. But if so, how were the cash payments to be made? Were they to be made as each three hundred thousand feet was delivered at La Crosse? The memorandum does not say so. It does not appear

that the sellers of the lumber were to trust the purchasers so far as to take such a risk as this. Again, when was the ten per cent to be reserved by Methudy & Meyer to be paid? We do not think that there is any sufficient evidence in the case from which the contract can be made out in all its terms. The mere fact that a written contract was to be subsequently prepared, does not show that a final agreement between the parties was not made, but it tends to show it; and, in this case, we think it clear that there was no contract to which the parties had agreed in all its terms; that there was to be a more explicit agreement, which was to be reduced to writing; that this was not done; and that there was no meeting of minds. The judgment was therefore for the right party, and it should not be disturbed.

But there appears no error which would warrant a reversal of the judgment. It is evident from the instructions given and refused, that the trial court based its action on one of the following theories: Either it found that the understanding between the parties was, that there was no agreement until the terms were reduced to writing — we believe that the evidence warranted such a finding, and was inconsistent with any other; or, perhaps, the trial judge found that the delivery of each three hundred thousand feet, on the cars at Wausau, and the payment of cash for the same, were to be mutual and concurrent acts, and that plaintiffs had failed to show that they were at any time ready at Wausau to make the cash payments and deliver the notes required. In this case we do not see that plaintiffs were wronged. Or, perhaps, the court found that plaintiffs knew that the lumber belonged to Leahey; that Scott and Ross had merely a lien upon it; and that the agreement with Leahey was, that the notes to be given should be secured, and that the agreement in this respect was not carried out.

Where the case is tried without a jury, instructions can be important only as showing the theory of the trial court of

the law applicable to the case. Appellant's counsel contends that some of the instructions given in the present case were ambiguous. He endeavors to give, to one of the instructions at least, a meaning which it was manifestly intended not to bear. An ambiguous instruction may mislead a jury, and thus be ground for reversing the judgment. But where there has been no jury, it is immaterial that an instruction may be susceptible of a double interpretation. It is for the parties to the suit to ask such declarations of law as shall make it clear what the trial court found as to the facts, and what it declared to be the law applicable to the facts. A judgment cannot be reversed on appeal on the theory that perhaps the trial court found a state of facts which, if found, ought to have led to a different judgment as a matter of law.

Plaintiffs asked an instruction, that "it is immaterial whether the title to the lumber mentioned in the petition was in the defendants or not, if it appears from the evidence that they had a bill of sale therefor recorded in the proper office, and undertook to sell it to plaintiffs." This instruction the court refused, as asked; but added the words, "as their own, and not as agents for another." Appellants' counsel contends that this clearly indicates that the trial court held, that if Ross & Scott, as between themselves and Leahey, were really only the agents of Leahey, then they could not effect a sale of this lumber without Leahey's assent, though they had a bill of sale of the lumber from Leahey, and the purchaser was ignorant of some secret understanding between them and Leahey, that this bill of sale was only a mortgage. The action of the court, however, seems to have no such meaning. If Leahey put it in the power of Scott to sell the lumber as his own, and Scott did so, then it would not lie in Leahey's mouth, or in Scott's mouth, to say after a sale, that Scott had no title. But if Scott never attempted to sell the lumber as his own, but only as agent for Leahey, and the purchaser knew that the

bill of sale merely gave a lien for advances, the purchaser would not be justified in dealing with Scott as with a principal. The action of the court seems to intimate no more than this.

We have very carefully examined the evidence in this case, and are convinced that it warrants the judgment; and we are unable to find in the objections of appellants any ground for interference. The judgment is affirmed. All the judges concur.