BY THE

ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

## MARCH TERM, 1915.

---

T. C. BOTTOM PRODUCE COMPANY, Appellant,
v. N. J. OLSEN, F. O. OLSEN, N. R. OLSEN and
D. D. SIMMONS, Doing Business as N. J. OLSEN
COMPANY, Respondents.

**Kansas City Court of Appeals, March 1, 1915.**

1. **CONTRACTS: Damages: Formal Contract.** Where the parties
to a contract have given it a particular construction, such con-
struction will generally be adopted by the court in giving effect
to its provisions. And the subsequent acts of the parties, showing
the construction they have put upon the agreement themselves,
are to be looked to by the court.

2. ———: ———: ———. If the material terms of contract,
though subsidiary in their nature, have yet to be agreed upon
and something in that case remains to be done besides the
merely formal act of writing and signing the agreement, there
is no meeting of minds and no contract.

Appeal from Jackson Circuit Court.—*Hon. Jos. A.
Guthrie*, Judge.

188 Mo. App.]                    (181)

AFFIRMED.

*Hunt C. Moore* and *A. F. Smith* for appellant.

(1) The defendants having made an offer by telegram for the sale of potatoes to plaintiff and the plaintiff having accepted the same by telegram, a complete contract was made. An effort on the part of one or both of the parties thereafter to put said contract in more formal shape did not make the contract incomplete. McDerMott v. Centennial, etc., Assn., 24 Mo. App. 73; Meissner v. Standard, etc., Co., 211 Mo. 112, 133; Hudson v. Rodgers, 121 Mo. App. 168, 175, 176, and cases cited. (2) A custom to put a contract made by telegrams in more formal shape cannot make incomplete a contract which the law declares is complete, and this is particularly true when there is question as to the existence, certainty, universality, notoriety, uniformity or reasonableness of the alleged custom. Southwestern, etc., Co. v. Standard, 44 Mo. 71, 82, 83; Ober v. Carson's Executor, 62 Mo. 209, 214; Goodfellow's Executor v. Meegan, 32 Mo. 280, 284; Wolff v. Campbell, 110 Mo. 114. (3) A contract to be performed at a future date is broken by the final declaration of either of the parties prior to the time of performance that he will not perform such contract. Roehm v. Horst, 178 U. S. 1. (4) Damages for the breach of a contract to deliver personal property at a future date, when broken prior to the time of performance, is the value of such property for future delivery at the date when the offending party finally declares that he will not perform. Roehm v. Horst, 178 U. S. 1, 21; Wall v. Schneider, 59 Wisc. 352; 18 N. W. 443, 445; Dewey on Contracts for Future Delivery, page 177.

*Park & Brown* for respondents.

(1) There was no meeting of the minds of the parties and therefore no binding contract. Parties in-

tended to be bound by written contract only.    Bourne
v. Shapleigh, 9 Mo. App. 64; Methudy v. Ross, 10 Mo.
App. 101; Green v. Cole, 103 Mo. 70; Commercial Teleg.
Co. v. Smith, 47 Mun. 494; Kirwan v. Byrne, 9 Misc.
(N. Y.), 76; Fullerton v. Dalton, 49 N. Y. 659; Bryant
v. Ondark, 87 Hun. 474; Irish v. Pulliam, 32 Neb. 24;
Wood v. Edwards, 19 Johns. 212; Chapline v. Stone, 77
Mo. App. 529; Lowery v. Danforth, 95 Mo. App. 450;
Scott v. Davis, 141 Mo. 225.    (2)    If any contract ex-
isted, there was no breach which warranted plaintiff
in bringing suit.    Dingley v. Oler, 117 U. S. 490; Roehm
v. Horst, 178 U. S. 1; Benjamin on Sales, 424.    (3)
This action was prematurely brought.    Dingley v. Oler,
supra; Roehm v. Horst, supra.

JOHNSON, J.—Plaintiff sued, November 12, 1913,
to recover damages for the breach by defendants of a
contract to deliver 5,000 bushels of seed potatoes at the
price of seventy cents per bushel.    A jury was waived
and at the close of the evidence the court rendered
judgment for defendants on the ground that the alleged
contract of sale was not proved, and plaintiff appealed.
    Plaintiff was a wholesale dealer in produce in Kan-
sas City and defendants were partners engaged in
similar business in Moorhead, Minnesota.    There is a
large demand each Spring by potato growers in the
territory of which Kansas City is the market, for seed
potatoes produced in South Dakota in the country near
Moorhead, and it appears that orders for Spring de-
liveries of such potatoes are placed by Kansas City
dealers with dealers in Moorhead far in advance of the
time for delivery.
    July 30, 1913, plaintiff telegraphed defendants:
"Quote twenty cars strictly first-class screened Red
River Ohios delivered here, or points taking same rate
from Moorhead, March fifteenth to thirtieth usual de-
posit.    Now Olsen figure us close price and will try do

business and remember we want best quality for our growers in this section."

The term "screened Red River Ohios" meant "Ohio" potatoes grown in the Red River country in South Dakota and passed over a screen of one and five-eighths inch mesh to take out those which were not large enough to pass over the screen. "Delivered here or points taking same rate from Moorhead" meant that the quoted price should include delivery by the seller at Kansas City or at some other point at the option of the buyer which had the same freight rate on shipment of potatoes from Moorhead.

On the same date, defendants, over their partnership signature telegraphed plaintiff in reply: "Offer ten cars screened Red River Ohios seventy cents sacked delivered Kansas City rate points shipment March fifteenth to thirtieth usual deposit. Growers here beginning to talk light yield account some stem rot. Do not think there is much to it but prefer not to sell too much ahead till we find what there is in it."

On the next day (July 31) plaintiff answered by wire: "Will take ten five hundred bushel cars Red River Ohios delivered March fifteenth to thirtieth seventy cents per bushel and pay cash deposit fifty dollars per car which is customary here to growers."

Defendants replied by wire the same day: "Confirm ten cars seventy cents per your wire." The following day plaintiff wrote defendants: "Your wire confirming our order for ten cars of Red River early Ohios received, and we would like you to draw up a contract conforming with the terms and stipulations of our wires, and we will send you draft for the $500 deposit." Defendants answered by letter dated August 4th, saying: "We have yours of 1st and enclose contract signed in duplicate, one of which you can sign if you wish and return to us with check." The enclosed contract was signed, not by Olsen & Company with whom negotiations had been conducted, but "The Red

River Valley Seed House Inc., by D. D. Simmons, V. Pres.''

We infer from the evidence that the name signed to the contract was that of a corporation which succeeded the partnership about August 1st. The contract was as follows: "In consideration of $500 to be paid to us at Moorhead, Minnesota, by the T. C. Bottom Produce Co. of Kansas City, Missouri to apply on purchase price at rate of $50 per car we hereby agree to furnish ten cars of 500 bushels each first-class screened Red River Early Ohio potatoes for seventy cents per bushel sacked in even weight two bushels new sacks less freight to Kansas City or points taking same rate of freight. Shipment March 15 to 30, 1914.''

Under date of August 8th, plaintiff wrote defendants: "We have your contract for the ten cars of Ohios which we purchased from you to be delivered in March. Mr. Bottom is out of the city to be gone about a week, and we will show him the contract on his return, and he will write you and close up the deal.'' August 20th, defendants, over their partnership signature, wrote plaintiff: "Will you please return the contracts properly signed which we sent you sometime ago for the ten cars ordered for March delivery and oblige.''

On the same day plaintiff wrote defendants: "Mr. Bottom has been detained from home by sickness in his family but we look for him at any time now, and will let you have contract on the potatoes bought from you. What price could you make us on a few more cars of choice screened stock for March delivery; let us hear from you if you have anything to offer.'' And on August 22d, wrote: "We have yours of the 20th in regard to the signature of the contract for the ten cars potatoes bought from you, and in reply will say that our Mr. Bottom is still out of the city, but we expect him back about Wednesday of next week, at which time we will take the matter up with you.''

August 25th defendants wrote, "We have yours of the 22d. Wish you would decide this matter not later than Wednesday as we wish to know whether or not we have a sale." August 27th plaintiff, by its president, telegraphed: "Returned home today sending you contract and deposit today." On the same day plaintiff wrote defendants: "The writer returns to Kansas City today and finds your several letters in regard to our purchase of ten cars potatoes from you on July 31st. The contract which you sent us was so indefinite, and not in keeping with the terms and stipulations of the wires that passed between, and our Mr. Gonder did not feel justified in accepting the contract, without referring the matter to the writer. We enclose you a contract which we believe covers carefully the terms and stipulations contained in our wires, though you will note that we do not mention in here, that this five thousand bushels is to be shipped in ten cars of 500 bushels each, and the reason that we did not insert that was because we think it very likely that we can allow you to load some of these cars a great deal heavier than 500 bushels each, which, of course, would be to your advantage, as cars might be scarce, and the heavy loaded cars can be handled a little more safely from frost, and a fewer number of cars costs less to deliver, and less for messenger service. It is very likely that all these cars, in fact, we have already sold the ten cars to another firm, and it is more than likely that they will be shipped to nearby points in Missouri. Enclosed find our check $500 to apply on the contract. Please sign one copy of the contracts and return to us."

The contract enclosed with this letter was as follows: "The said party of the first part contracts to sell and agrees to deliver to the party of the second part 5000 bushels of strictly choice Red River early Ohio Seed potatoes, at and for the agreed price of seventy cents per bushel sacked delivered to Kansas

City or points taking same rate: Potatoes to be put up in even weight two bushel stencil bags; said delivery to be made at the option of the first party, any time between March 15th and March 30, 1914. The 5000 bushels of potatoes shall be in all respects first-class quality, true to name, and screened over a one and three-quarter inch screen, and delivered to party of the second part free from frost, and shipped from loading station taking twenty-six and one-half cents rate to Kansas City.

The second party contracts to purchase and agrees to accept the 5000 bushels potatoes under the terms and conditions set forth above, and to pay on the within contract $500, which is part of the purchase price of the said 5000 bushels of potatoes at seventy cents per bushel f. o. b. Kansas City or points taking same rate, receipt of which is hereby acknowledged by the first party. The second party further agrees to pay to the first party or their duly authorized agent, the balance of the purchase price due on said potatoes, when delivery is made.''

Defendants promptly returned the check and contract unsigned in a letter in which they cancelled the order on the ground of plaintiff's failure to close the contract in a reasonable time and its attempt to inject new terms and conditions into the contract. The specific points of difference between the agreement made by correspondence and the contract submitted by plaintiff were stated in the letter to be, first, a material difference in the definition of the quality of the potatoes to be shipped; second, the requirement in the contract sent by plaintiff that the potatoes be run over a one and three-fourth inch screen, when no size was specified and it was customary to use a one and five-eighth inch screen; third, the requirement, not stated in the correspondence, that the potatoes be loaded at points from which the freight rate to Kansas City was twenty-six and one-half cents per hundred pounds,

when it was customary for shipers to exercise the option of loading at points which had a different rate, and, fourth, the requirement, not mentioned in the correspondence, that the potatoes be shipped in stencilled sacks.

Plaintiff, under date of September 1st, replied by letter refusing to accept the cancellation of the order and enclosing a new contract which conformed to that stated in the correspondence, together with a check for $500 to cover the initial deposit. Defendants returned the check and contract in a letter in which they said: "Our Mr. Simmons is away and has already sold the ten cars offered you July 30th and the deal is closed as far as we are concerned. These cars were sold since our last letter to you of August 29th at practically the same price as offered to you. We could not afford to hold the deal open any longer as others were ready and waiting to take them on same terms as we offered to you."

Plaintiff then employed a mercantile agency in Chicago which was resorted to by produce dealers for aid in the adjustment of their differences and the agency wrote defendants a letter in which it tendered its "good offices" to bring about a settlement of the controversy. Defendants answered defending their course, but ending with an intimation that they might reopen the negotiations with a view to an amicable settlement: "We appreciate your good offices, however," they said, "and if you will send us the contract which Bottom finally offered to sign, we will agree to give it prompt attention and either accept or reject it by return mail. If you wish to do this, send us the contract at once, and we will get this matter out of our system." This letter was written October 17, 1913, about three weeks before this suit was brought. The agency did not send the contract to defendants as requested and nothing further was done towards a friendly settlement. There is evidence tending to show that the

market value of such potatoes for delivery in the following March began to advance sometime after the date of defendant's telegram accepting the order and was eighty cents per bushel from August 29th to September 3, 1913, and from March 15th to March 30, 1914, was eighty-six cents. It dropped to seventy-five cents about March 30th.

In its letter of September 1, 1913, refusing to accept a cancellation of the order and enclosing a contract conforming to the agreement reached by correspondence, plaintiff first took the position that the correspondence constituted a binding contract and that a more formal written contract was not essential. "We have read all of our messages over carefully and while they are a contract within themselves, we think the contract which we enclose you today covers the points mentioned in the messages." This was the reverse of the position first taken by plaintiff in its letter of August 1, in answer to defendants' telegram accepting the order, where the payment of the deposit of $500 was conditioned by plaintiff upon the execution of a formal written contract "conforming with the terms and stipulations of our wires." Counsel for plaintiff base the cause of action on the ground that "defendants having made an offer by telegram for the sale of the potatoes to plaintiff and the plaintiff having accepted the same by telegram, a complete contract was made. An effort on the part of one or both parties, thereafter, to put said contract in more formal shape, did not make the contract incomplete" and that defendants' subsequent cancellation of the order was a breach of the contract made by telegram which, as stated, required no more formal expression.

Obviously counsel are driven to take this position since if they should concede that the parties intended that the contract should not become binding until reduced to a formal paper signed by both parties, the conclusion would be inevitable that there had been no

meeting of minds and, therefore, no binding contract. The contract drawn by defendants in response to plaintiff's request accurately and sufficiently expressed the terms of the agreement reached by correspondence but was signed, not by defendants, but by a stranger to the negotiations. The contract afterward submitted by plaintiff evidenced an agreement entirely different from that expressed in the correspondence and defendants properly refused to sign it on that ground, as well as on the ground that plaintiff had unreasonably delayed closing the transaction and paying the deposit, the prompt payment of which obviously was intended should be precedent to the creation of any obligation on the part of defendants to deliver the potatoes. On the hypothesis that a formal contract was necessary it is clear plaintiff would have no case.

But invoking the rule that where the parties have agreed to all the terms of a contract, the sole fact that the formal paper by which they intended that it should be evidenced has not been formally executed, will not necessarily be fatal if the contract has been made by correspondence (Bourne v. Shapleigh, 9 Mo. App. 69), plaintiff would have us brush aside all considerations of delay and dispute over the formal reduction of the contract and treat defendants' cancellation of the order as a breach of a contract completed by defendants' telegram accepting plaintiff's offer. It is argued that we should disregard the interpretation of the parties (especially that of plaintiff) of the agreement they reached in the correspondence, for the reason that the agreement thus made was clear and sufficiently covered all essential points of the proposed sale and that in such cases the rule that courts will adopt the construction the parties have given to their contract does not apply. There is no question of the soundness of this view of the law. In Meissner v. Equipment Co., 211 Mo. l. c. 133, the opinion quotes with approval the doctrine stated in 9 Cyc. 588, et seq., that "Where the parties to

a contract have given it a particular construction, such construction will generally be adopted by the court in giving effect to its provisions. And the subsequent acts of the parties, showing the construction they have put upon the agreement themselves, are to be looked to by the court, and in some cases may be controlling. . . . The rule above stated does not apply, however, where the meaning of the terms used is clear. In such a case the fact that the parties have themselves by their subsequent conduct or otherwise, placed an erroneous construction upon them will not prevent the court from giving the true construction.''

The fact that plaintiff erroneously interpreted the agreement to mean that no binding contract would be created until formal written expression of it had been made by the parties and that defendants acquiesced in that view would not preclude plaintiff from afterward taking the opposite position, if, in law, the correspondence evidenced a binding contract which needed no more formal expression. But plaintiff may be suffered to escape the rule that courts will adopt the construction of a contract the parties themselves have given it, only upon the theory that the agreement evidenced by the correspondence was clear and unambigous and embraced all the elements of a valid contract of sale. ''If nothing remains but to reduce the contract to writing according to the terms explicitly agreed upon, it may be immaterial that this has not been done. But it is not enough that the main features of the contract have been fixed by mail. If material terms, though subsidiary in their nature, have yet to be agreed upon, something in that case remains to be done besides the merely formal act of writing out and signing the agreement. There has been no meeting of minds and no contract.'' [Bourne v. Shapleigh, supra; Methudy v. Ross, 10 Mo. App. 101; Green v. Cole, 103 Mo. 70; Commercial Tel. Co. v. Smith, 47 Hun, 494; Kirwan v. Byrne, 9 Misc. (N. Y.) 76, 29 N. Y. S. 287; Bryant v.

Ondrak, 87 Hun 474; Irish v. Pulliam, 32 Neb. 24; Wood v. Edwards, 19 Johns. 212; Chapline v. Stone, 77 Mo. App. 1. c. 529; Lowrey v. Danforth, 95 Mo. App. 1. c. 450; Scott v. Davis, 141 Mo. App. 1. c. 225.]

We agree with plaintiff that the agreement reached in the correspondence was clear, unambigous, definite, and embraced all the elements of a valid, binding contract, leaving no material terms to be agreed upon. But in standing upon that contract and repudiating its own subsequent construction of it, plaintiff will not be allowed to play fast and loose, to say in one breath that its subsequent delay and the controversy over the terms of the written contract were wholly immaterial, and in the next, that they afforded a valid excuse for plaintiff's failure to perform conditions of the contract it was bound to perform.

The contract clearly expressed the mutual intention that plaintiff immediately following the acceptance of the order would make the cash deposit of $500 with defendants and that if this were not done no obligation on the part of defendants to deliver the potatoes would arise. Instead of performing this condition, plaintiff evaded it by offering to make the deposit on the execution of a formal contract, and then retained the contract (promptly sent by defendants) without objection for more than three weeks, in the face of repeated requests from defendants that it be signed and returned without further delay.

On the theory that a complete contract was made by correspondence, plaintiff had no excuse for not immediately paying the amount of the deposit. Certainly its desire that the contract should be put in formal shape was no legal justification and defendants' consent to sign a formal contract clearly was not intended to be, and should not be construed as a waiver of the performance by plaintiff of any of the terms of the contract. Plaintiff breached the contract by its unreasonable delay in forwarding the deposit and was in de-

fault when defendants elected to cancel the order. Thus it appears that in any possible view of the case plaintiff has no cause of action. If a complete contract was entered into by correspondence plaintiff was guilty of a breach of that contract which justified defendants in rescinding it. If the correspondence left something still to be agreed upon in a subsequent formal contract, the parties failed to come to an agreement, and there being no meeting of minds in mutual agreement, there was no binding contract.

The court did not err in rendering judgment for defendants.

Affirmed. All concur.