MISSISSIPPI AND DOMINION STEAMSHIP COMPANY, LIMITED,

*vs*

GUSTAVUS F. SWIFT, and others.

Cumberland.    Opinion February 24, 1894.

</div>

<div align="center">*Contracts. Negotiation. Completion. Signing.*</div>

Upon the question whether the signing a written draft of the terms is essential to the completion of a contract, *Held;* If the written draft is viewed by the parties merely as a convenient memorial, or record of their previous contract, its absence does not affect the binding force of the contract :— if, however, it is viewed as the consummation of the negotiations, there is no contract until the written draft is finally signed.

The burden of proof is upon the party affirming the completion of the contract before the written draft is signed.

In determining which view is entertained in any particular case, several circumstances may be helpful, as : whether the contract is of that class which are usually found in writing ; whether it is of such nature as to need a formal writing for its full expression ; whether it has few or many details ; whether the amount is large or small ; whether it is a common or unusual contract ; whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations.

If a written draft is proposed, suggested or referred to, during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract.

ON REPORT.

This was an action brought in this court, in Cumberland county, for the recovery of $24,690.08, damages for breach of a contract claimed by the plaintiff to have been made with the defendants, by which it chartered to the defendants certain space, at a price designated, on the three steamers, Vancouver, Sarnia and Oregon, owned by the plaintiff company, which space was to be fitted with refrigerators and used by the defendants for the shipping of dressed meat.

The principal part of the evidence consists of letters and telegrams between David Torrance & Co., steamboat agents of the plaintiff company, who had an office both in Montreal and Portland, and these defendants, represented by Mr. Edwin C. Swift, at Boston. The correspondence beginning November 19, 1889, and continuing until the latter part of 1890, is stated in the opinion of the court.

The plaintiff claimed that the minds of the parties were together and that the contract was complete April 5, 1890. Plea, general issue and the statute of frauds. The defendants denied that any contract was made or signed.

*Symonds, Snow and Cook,* for plaintiff.

Statute of frauds. Contracts to be performed within one year : *Farwell* v. *Tillson,* 76 Maine, 227 ; *Duffy* v. *Patten,* 74 Maine, 396 ; *Walker* v. *Johnson,* 96 U. S. 424. Memorandum : *Ryan* v. *U. S.* 136 U. S. 68, p. 83 ; *Jenness* v. *Iron Co.* 53 Maine, 20 ; *Williams* v. *Robinson,* 73 Maine, 186 ; Wood on Fraud, § 345 ; Browne Stat. Fr. § 371 ; Chitty Cont. p. 95, n. P ; Addison Cont. 8th Ed. App. p. 266 ; *Atwood* v. *Cobb,* 16 Pick. 227.

The memorandum in this case shows a definite offer and an equally definite acceptance, together with a tender of performance by the plaintiff and a promise of immediate performance by the defendants. The fact that matters of form or detail were still to be arranged does not in any way invalidate the contract thus made by the parties. The contract was made by the acceptance of the offer duly communicated, and this contract shewn by the memorandum is not affected by the mere circumstance that the parties intended to enter into a formal future contract. *Bonnewell* v. *Jenkins,* 8 L. R. Ch. Div. 70 ; *Gibbins*

v. *The North Eastern Metropolitan Asylum District*, 11 Beavan, 1; *Darlington Iron Co.* v. *Foote*, 16 Fed. Rep. 646; Fry on Specific Performance, § 492.

Defendants' acceptance of April 5th, was absolute and not in any way contingent upon the execution of a future formal contract, and it constituted a final agreement between the parties, which could not be affected by any more formal contract. *Chinnock* v. *Marchioness of Ely*, 4 DeG. J. & S. 638; Fry on Specific Performance, § 492.

The recognition of the contract may be contained in a letter, and if it admits the contract and refers to the memorandum in such a manner that the court can connect it therewith, and ascertain the terms of the contract without the aid of parol evidence, it is sufficient to bind the defendants, although they did not intend thereby to ratify the contract. Brown on Stat. Frauds, § 346; Wood on Frauds, § 345.

*Savage and Oakes*, *Freedom Hutchinson*, of Boston bar, and *Clarence Hale*, for defendants.

SITTING: PETERS, C. J., WALTON, EMERY, FOSTER, HASKELL, WHITEHOUSE, JJ.

EMERY, J.   A full exposition of our judgment in this case, requires an extended statement of the evidence and the authorities, notwithstanding constant effort at abridgment.

The plaintiff steamship company owned and operated a line of ocean steamships plying between Liverpool and Montreal in the summer, and between Liverpool and Portland in the winter. The American agents of the company were David Torrance & Co. with offices in Montreal and in Portland. Three of the steamships were named respectively, Sarnia, Oregon and Vancouver.

The defendants, Swift & Co., located at Boston, were large shippers of dressed meats from the United States to Europe. This kind of merchandise, being fresh meat, could not be shipped, stowed and transported across the ocean like ordinary merchandise, upon mere bill of lading. Its suitable transportation required that certain spaces in the steamship should be set

apart for its reception, refrigeration and care during the voyage. This space was necessarily engaged for some time prior to the shipping, that it might be properly fitted up, and it was necessarily to some extent at the disposal of the shipper, and under his control during the term of the contract. There were two modes of refrigeration in use, one by ice, and a new one by the Kilbourn process, so-called.

In this condition of affairs, Torrance & Co., November 19, 1889, opened a correspondence with Swift & Co. relative to space on the company's steamers for the transportation of dressed beef. In the first letter, November 19, Torrance & Co. advised Swift & Co. that they were prepared to negotiate for such space on the Sarnia and Oregon, and were prepared to offer such space at twenty shillings per forty cubic feet on those steamers, retaining liberty to substitute the Vancouver for one of the others later on. There was no reply to this letter, and on January 19, 1890, Torrance & Co. again wrote Swift & Co. naming the sailing dates of the various steamers, and inviting bids. No reply being received, Torrance & Co. on February 6th, again invited the attention of Swift & Co. to the matter. Swift & Co., February 12, wrote Torrance & Co. that one of their men would call upon them with reference to the matter. There seems then to have been some verbal conference, for on March 3d, Torrance & Co. wrote that the Liverpool managers were not inclined to accept the price named by Swift & Co., and " would only agree to fix the ships, provided you are willing to pay twenty shillings and take the space where we think it would be most profitable for the ship," and suggested that if Swift & Co. were inclined to do anything on these terms they might communicate with either the Montreal or Portland house. March 24, Torrance & Co. again wrote (this time from Portland, the other letters having been from Montreal,) that they would not be prepared to enter into a contract for the Vancouver, Sarnia and Oregon unless for one year, from Montreal in summer and Portland in winter, they reserving the right to withdraw the Vancouver in the winter.

The next day, March 25, Swift & Co. wired in answer as

follows : "Answering your letter, 24th, if accepted at once, we will take space in the three ships named, to be mutually agreed on at twenty shillings flat for summer navigation, we agreeing to continue shipments during the winter, if ships go from Portland or Boston, we paying your market price for beef space ; as we are negotiating with other parties, would appreciate your answer at once." Torrance & Co. wired same day from Montreal as follow : "We cannot change offer already made by our Portland house under instructions from Liverpool." Their Portland house on the next day, March 26, wrote for an answer to their proposition.   On March 27; Swift and Co. wired to the Portland house as follows : "Your favor of 26th just received.   We accept your proposition of 24th on three steamers. Please confirm by wire."

In the meantime, between the 24th and 27th of March, Torrance & Co., not hearing from Swift & Co., began negotiations with other parties and so informed Swift & Co. in answer to their telegram of the 27th.   March 29th, Swift & Co. wired that they wanted the space, and thought it should be accorded to them.   April 1st, Torrance & Co. wired as follows : "The decision has been given in your favor, and the three ships mentioned are at your disposal.   Sarnia expected Portland Thursday, will sail following Thursday."   On the same day, Torrance & Co. wrote that they had been relieved of their negotiations, and said, "We hasten to advise you that we are willing to contract with you for the three steamers on the terms already mentioned, and conditional on your putting in the cold air blast instead of the ice and we have wired you accordingly in these words, 'The decision has been given in your favor and the three ships mentioned are at your disposal.   Sarnia expected Portland Thursday, and will sail the following Thursday.'   You can arrange with our Portland house in reference to the contract." . . . To this telegram Swift & Co. wired answer as follows : "Your message received, thanks for same.   Shall we refrigerate Sarnia by old process this trip, or wait till first of May and use Kilbourn machine.   We have two machines to be delivered early in May."   Torrance & Co. replied by wire same day, April 1st,

as follows: "Wait till May. We don't want old process."
On April 5th, Swift & Co. wrote as follows: "Your favor of
April 1st, received, replying to same will say we will arrange
for fitting the three ships by the Kilbourn process as per your
request. I notice you say, 'The Toronto, one of our steamers
sailing between here and Liverpool all next season is due at
Portland on the 10th instant and should sail about the 15th. We
are open to negotiation for her if you are so inclined.' I suppose
all next season means the coming summer navigation for Mon-
treal. Will you kindly write us saying where this ship will sail
from during next winter; if she is to be in the regular service
we shall be pleased to negotiate with you."

Here the correspondence ceased for a time. In the meantime,
about the last of March, Mr. Foster, agent of Swift & Co.,
visited the steamers in Portland, took measurements of space in
different steerages, and had some conversation with the company's
marine superintendent about the location of spaces for refrig-
erators. He indicated what spaces he should want, but no
express stipulation was made that he should have them, or would
take them. Swift & Co. did nothing toward refrigerating
any space and the steamers carried cargo in all the steerages as
usual, leaving no space unoccupied.

July 8, 1890, Swift & Co. wired as follows: "Have no copy
of contract, please mail one to-day." On the same day Torrance
& Co. replied as follows: "We must apologize for not having
earlier sent you copy of the contract for dead meat space. We
shall however mail it to you to-morrow without fail." The next
day, July 9th, they further wrote as follows: "Owing to this
being our English mail day, we have been unable to put your
contract in form as promised but we will send it to you to-morrow."
July 10th, they wrote again as follows: "We now inclose you
copy of our proposed contract which we trust may be found to
be in accordance with the understanding arrived at last March.
We must apologize for not sending this yesterday but as it was
our mail day we were more than busy and this must be our
excuse. We trust you may soon be prepared to begin your
shipments." The draft of contracts inclosed was quite long.

The only date on the draft was "Montreal, 1890." This draft was never signed.

July 24, Swift & Co. wired that they could not use Kilbourn process and must use ice, and inquired if that would be satisfactory. July 26, Torrance & Co. replied by wire as follows: "Have cable authorizing you using ice but the other preferred. Can you refrigerate Vancouver? Will be here to-morrow. Sails Wednesday week."

Swift & Co. replied on July 28th that they could not refrigerate the Vancouver, and that their Mr. Foster would call on Torrance & Co., Wednesday morning. At this point the draft of contract had not been signed. Swift & Co. had taken no spaces and had made no shipments. The company had set apart no spaces but had filled them as usual with cargo.

This state of affairs continued till September 24th, 1890, when Torrance & Co. wrote to persuade Swift & Co. to hasten matters. Swift & Co. replied September 25th, that they did not feel like assuming · the responsibility of shipments in warm weather by either process as at present working. There was other correspondence following this and running up to October, 1891, in which Torrance & Co. insisted that Swift & Co. should carry out the arrangement, and Swift & Co. refused to recognize any arrangement as concluded. The result was that March 19th, 1892, this suit was brought to recover damages for the refusal of Swift & Co. to carry out the contract claimed by the plaintiffs to have been made. The company only claims as damages the profits at twenty shillings per forty cubic feet inasmuch as it filled the spaces, though at a less rate.

The plaintiff now contends that it appears from this correspondence, as explained by the oral testimony, that the terms of a complete contract were mutually agreed upon, April 5th, by Swift & Co.'s letter of that date; and that the parties then had mutually signified an intention to be bound. The defendants contend that the correspondence and the circumstances do not show that the terms of such a contract were then or ever agreed upon; and further, that the correspondence and circumstances do show that the parties contemplated that such terms as should

be agreed upon, should be expressed in some formal instrument, to be written and signed before any contract should be considered as complete. A formal draft of the terms of a contract was prepared by the plaintiff, but was not signed by either party. Was there a complete contract without that signing?

The burden is upon the plaintiff to maintain the affirmative.

Upon this question, the diligent counsel have cited numerous cases where a similar question has arisen and been discussed. A study of these cases has not been profitless. We summarize a few and quote from the opinions of several eminent judges. In *Chinnock* v. *Ely*, 4 De G. J. & S. 638, the defendant's solicitors wrote to the plaintiff naming the price for an estate about which they had been negotiating. The plaintiff wrote a letter in which he agreed to give the price named and then added, " I shall be obliged if you will forward me the usual contract." In reply, the defendant's solicitors wrote, " We have been instructed by the Marchioness of Ely to proceed with the sale to you of these premises. The draft contract is being prepared and will be forwarded to you for approval in a few days." Lord Chancellor Westbury held that, so far, the parties were in treaty merely, and that without the execution of the draft mentioned, there was no contract concluded. In *Bonnewell* v. *Jenkins*, 8 Ch. Div. 70, the defendant's agents offered certain premises for sale. The plaintiff wrote the agents, making an offer of £800 for the estate. The agents wrote in reply as follows, " We are instructed to accept your offer of £800 for these premises and have asked Mr. Jenkins' solicitor to prepare contract." The Lord Justices of Appeal held that there was a concluded contract. Thesiger, L. J., said, "The mere reference to a preparation of an agreement, by which the terms agreed upon would be put into a more formal shape does not prevent the existence of a binding contract." In *Rossiter* v. *Miller*, 5 Ch. Div. 648, there was much correspondence about a sale of certain lots of land, and the question arose whether the correspondence showed a completed contract, without the formal draft which had been referred to in some of the letters. James, L. J., said, "The reasonable view of the case is, that the parties intended the

signing of the formal contract to be a condition precedent." Coleridge, C. J., said, "If a set of terms be agreed upon in writing, they constitute a contract, although it may be the intention of the parties that they should be put into a more formal shape ; but here a set of terms was never agreed to." Baggallay, L. J., said, "The letters left the defendant a right to believe that the signing of a formal contract was necessary to create a binding agreement." In the same case upon an appeal to the House of Lords (3 App. Cas. 1124) Lord Hatherly said, "Although the correspondence may not set forth, in a form which a solicitor would adopt if he were instructed to draw an agreement in writing, that which is an agreement between the parties, yet, if the parties to the agreement, the thing to be sold, the price to be paid, and all those matters be clearly and distinctly stated, though only by letter, an acceptance clearly by letter will not the less constitute an agreement in the full sense between the parties, merely because the letter may say, we will have this agreement put in due form by a solicitor." Lord O'Hagan said, "The correspondence gives no color to the suggestion that the contract was not final and was not considered to be final by all the parties to it, because the formal agreement embodying its already settled terms had not been furnished." Lord Blackburn said, "The mere fact that the parties have expressly stipulated that there shall be afterward a formal agreement prepared, embodying the terms, which shall be signed by the parties, does not, by itself, show that they continue merely a negotiation. It is a matter to be taken into account, in construing the evidence, and determining whether the parties have really come to a final agreement or not; but as soon as the fact is established of the final mutual assent of the parties, so that those who draw up the final agreement have not the power to vary the terms already settled, I think the contract is completed." In the same opinion Lord Blackburn further said, "Parties do often enter into negotiation meaning that when they have (or think they have) come to one mind, the results shall be put into formal shape, and then (if on seeing the result in that shape, they find they are agreed) signed and made binding; but that each party is

to reserve to himself the right to retire if on looking at the formal contract, he finds that, though it may represent what he said, it does not represent what he meant to say. Whenever on the true construction of the evidence, this appears to be the intention, I think the parties ought not to be held bound till they have executed the formal agreement." In *Ridgway* v. *Wharton*, 6 H. L. Cases 238, Lord Chancellor Cranworth said, "If parties have entered into an agreement, they are not the less bound by that agreement because they say, we sent it to a solicitor to have it reduced into form; but when the parties negotiate and do not say so, the mere fact that they do send it to a solicitor to have the matter reduced into form, affords to my mind generally cogent evidence that they do not intend to bind themselves till it is reduced into form." Lord Wensleydale said, "These cases often occur in courts of law and the question then always is, whether the parties mean to embody the contract made by parol, in writing. If they do, nothing binds them till it is written. If they enter into a contract with a view to a written agreement, nothing will bind them but that written agreement, and that quite independently of the Statute of Frauds applying to all agreements." . . . "If the parties agree finally to be bound by any terms, and then for the sake of preserving a memorial, having agreed to the original terms, they get a document drawn up, there is no doubt they are bound by the original terms." In *Morrill* v. *Tehama M. & M. Co.* 10 Nev. at page 135, the court declared the general rule to be, that where the parties enter into any general agreement, and the understanding is that it is to be reduced to writing, or if it is already in a written form, that it is to be signed before it is to be acted on, or to take effect, it is not binding until it is so written or signed. In *Methudy* v. *Ross*, 10 Mo. App. 106, the court said, "The mere fact that a written contract was to be subsequently prepared, does not show that a final agreement between the parties was not made, but it tends to show it; and in this case we think it clear that there was to be a more explicit agreement which was to be reduced to writing; that this was not done and that

there was no meeting of minds." In *Eads* v. *Carondelet*, 42 Mo. 113, the plaintiff made to the city of Carondelet a written proposition, containing the terms on which he would build gunboats in that city. The city council passed an ordinance reciting the proposition and expressly accepting it as made; but in the second section of the ordinance, directed and empowered the mayor to enter into a written contract with the plaintiff, and employ counsel to draft the contract. The plaintiff carried out his proposition, but the city failed to perform any part. *Held*, that the city was not bound, as further formality was contemplated. In *Water Commissioners* v. *Brown*, 32 N. J. L. 504, Brown made a proposition to the commissioners to do certain work in laying pipe. The commissioners accepted the proposition and directed a written contract to be prepared. This was done, but it was not signed. *Held*, that the commissioners were not bound. In this case, however, the law provided that the contracts of the water commissioners should be in writing. This fact showed conclusively that a written contract must have been contemplated. In *Congdon* v. *Davy*, 42 Vt. 478, the negotiation was for building a dwelling-house by the plaintiff for the defendant. Everything was agreed upon, and it was also agreed that the contract should be put in writing if the defendant desired. The defendant afterward expressed such desire, and a writing was prepared, embodying the agreement, but the defendant refused to sign it. *Held*, there was no completed contract.

From these expressions of courts and jurists, it is quite clear that, after all, the question is mainly one of intention. If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: if the written draft is viewed by the parties merely as a convenient memorial,

or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed.

In determining which view is entertained in any particular case, several circumstances may be helpful, as : whether the contract is of that class which are usually found to be in writing ; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract ; whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested or referred to, during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract.

Still, with the aid of all rules and suggestions, the solution of the question is often difficult, doubtful and sometimes unsatisfactory. An illustration of this, is the case of *Rossiter* v. *Miller*, above quoted from. In that case, Lord Chief Justice Coleridge and Lord Justices James and Baggallay, three of England's most distinguished judges, were clear that there was no contract for want of a formal draft. Lord Chancellor Cairns, and Lords Hatherly, Blackburn and Gordon, equally able and eminent jurists, were confident in the contrary opinion.

We come now to the consideration of the circumstances and correspondence in this case.

The attempt was to negotiate a contract for the use of space on ocean steamers, of which the shippers were to have control to some extent, and in which they were to set up their appliances, and load and care for their own merchandise. This arrangement is quite different from the ordinary contract of affreightment. It is like a charter-party, which is almost universally reduced to formal written draft.

The negotiations contemplated not simply a contract for one area of space on a single steamer for a single trip. The contract was to be for a year, and for different areas of space on three different ships. The interests of the contracting parties in those

spaces were so various and, if not conflicting, yet in such close contact, that a contract would need to contain many stipulations in order to sufficiently define the rights and duties of the parties. The draft prepared by the steamship company would, if printed in this type, occupy over three pages of this volume. It contained some twenty-one distinct stipulations, many of them nowhere alluded to in the correspondence or conversations, and yet seemingly essential to be agreed upon in a contract for chartering space on ocean steamers for the transportation of dressed meats. It had annexed as a part of itself a long printed blank bill of lading. The elder Torrance testified that all the details in the written draft were the well-understood custom of the trade, and understood in every similar contract. He also testified that " the contract was carefully drawn up," and that when he drew it, he had before him several other contracts. So far as the case shows, the draft was entirely in manuscript. No printed blanks seem to have been in existence, as there probably would have been, had the numerous details become crystallized into a well-understood custom. The defendants deny the existence of any such custom, or understanding.

The claim of the plaintiff company that it would have made nearly $25,000.00 profits by such a contract, shows that the negotiations were not about a trifle.

The correspondence seems to indicate that a formal draft of the contract was in the minds of the parties, or at least in the mind of the defendants, as the only authoritative evidence of a contract. In the first letter, that of November 19, Torrance & Co., the plaintiff's agents, write that they are authorized, "To make a contract for dressed beef on our steamers, Sarnia and Oregon, and we hasten to advise you that we are prepared to discuss the matter with you." In the second letter they invite a bid. In the letter of March 3rd, 1890, they name terms and then say, "If you are inclined to do anything on these terms, you might further communicate with us or our Portland house." In the letter of March 24th, from Portland, they say, "We would not be prepared to enter into a contract with you for the Vancouver, Sarnia and Oregon unless for one year, from Mon-

treal during the summer and Portland in winter, we reserving the right to withdraw Vancouver during the winter." In the letter of April 1st, they say, "You can arrange with our Portland house in reference to the contract." July 8th, the defendants wired for a copy of the contract to be sent. On the same day Torrance & Co. write apologizing for neglect to send copy. July 10th, Torrance & Co. send the written draft which has been above described, and write, " We now inclose you copy of our *proposed* contract, which we trust may be found in accordance with the understanding arrived at last March."

Neither party, during all the correspondence, seems to have made any change in his business operations by reason of anything in the correspondence. No dressed meats were shipped by the defendants or offered for shipment. No space was reserved by the plaintiff and there was no delay or hindrance suffered in its regular business.

The case is by no means free from doubt and difficulty, but due reflection and study of the evidence have at the last brought us to the conclusion, that what the plaintiff claims to have become a perfected contract on April 5th, 1890, by the defendant's letter of that date, was at the most only the acceptance of the proposed basis of a contract, which was yet to be perfected as to details, and put in writing; and that the defendants did not have, nor signify, any intention to be bound until the written draft had been made and signed.

*Judgment for defendants.*