## STATE Y. M. C. A. v. PICHER.
### No. 969.

District Court, D. Maine.

Oct. 19, 1934.

Carl C. Jones, of Portland, Me., for plaintiff.

F. Harold Dubord, of Waterville, Me., for defendant.

PETERS, District Judge.

This suit was instituted by the plaintiff to establish a trust as against the failed People's-Ticonic National Bank of Waterville, and to secure priority of payment from the assets in the hands of the receiver.

I find the pertinent facts to be as follows: Prior to February 10, 1933, the plaintiff, in connection with its well-known charitable and benevolent activities, had received a gift of $30,000, which was in the form of a check on a New York bank. The business affairs of the plaintiff, which is a corporation, were being carried on by Mr. Brown, its treasurer, and Mr. Smith, its secretary. It having been determined to use $13,000 of the above amount for current needs and to reserve $17,000 for the following year, these officers, on the above date, consulted the president of the bank about collecting the check, and also about

handling and safeguarding that part of it to be reserved for future use. The president of the bank, after hearing the story, and learning that they had been considering the taking of $17,000 of the amount and depositing it in four savings banks, offered to collect the check through his banking facilities and to consider and later advise as to how best protect that sum.

The check for $30,000, indorsed by the payee, was left with the bank for collection and deposit to the credit of the Y. M. C. A. in its regular checking account. The president of the bank knew the high standing of the plaintiff and its officers, and, upon being assured of the solvency of the maker of the check, gave credit at once for the $30,000, and permitted Mr. Brown, as treasurer, to draw on the account then and there to the amount of several thousand dollars. The plaintiff's regular passbook, in which were entered by the bank the deposits when made, had been left at the Y. M. C. A. office, but it was sent for by Mr. Smith and brought to the bank and the credit of $30,000 entered therein by an officer of the bank and the book delivered to Mr. Brown or Mr. Smith.

The bank sent the check directly to New York for collection, where it was collected, and the People's-Ticonic Bank received credit for the amount on its account with its correspondent, Fidelity Trust Company of Portland, the next day. No part of the funds from this check was ever segregated from the other assets of the bank. It was all a routine matter of debit and credit. The collecting bank in New York credited the Fidelity Trust Company, that bank credited the Ticonic Bank, and the Ticonic had already credited the plaintiff. No one in behalf of the plaintiff asked for any different arrangement, and never asked for any part of the $30,000 in cash, or that any part of it be kept separate from the rest, but left it all to its credit in the bank in its regular checking account with other amounts deposited before and afterward, the total of which was drawn against from time to time as required, until at the time the bank closed the amount to the credit of the plaintiff was drawn down to about $21,000. Both the passbook of the plaintiff and the usual deposit slip made out by a clerk at the time, when called in for that purpose by the president of the bank, show simply a deposit of $30,000 to the credit of the Y. M. C. A., in the usual course of business. This was understood by all parties at the time. The officers of the plaintiff expected to make a division of the money later and to lay aside and specially safeguard $17,000 of the amount for future use, and the president of the bank understood that that was the intention. Plaintiff's counsel endeavors to have the transaction considered as a special deposit or a special collection of the check with the proceeds to be held apart from other funds; but the evidence will not warrant that construction. The transaction, participated in by all parties, at the conclusion of the conversations on February 10, cannot be differentiated from that of the ordinary deposit in a bank to the credit of the depositor's checking account. Mr. Brown, the treasurer, and Mr. Smith, the secretary, were content at the time to leave all the money in the bank to the credit of the plaintiff for the short period they thought would elapse before arrangements would be made to take $17,000 from the account and secure it in some way to be agreed upon.

The situation so remained for several days while the officers of the plaintiff and the president of the bank were discussing what measures should be taken touching the amount of $17,000 which the plaintiff's officers intended to reserve for later use. Finally the president of the bank proposed that it should hold that amount in trust. A discussion of the terms of the proposed trust followed, and the president of the bank offered to have his trust officer draw up a written agreement. One was drawn and submitted to the plaintiff's officers, but was not satisfactory and was rejected. Shortly after, another memorandum was submitted in the form of a proposed written agreement to be signed by both parties. A special meeting of the executive committee of the plaintiff was called for its consideration. This was on February 28th, and at that meeting the following vote was passed as recorded: "At the afternoon meeting Mr. Smith described at length the trust agreement that had been prepared for safeguarding the balance of cash on hand. A vote was passed allowing Mr. Brown and Mr. Smith to complete the agreement with the People's-Ticonic Bank."

The next morning, on March 1st, Mr. Brown told the trust officer of the bank that the committee accepted the proposed arrangement and were ready to go ahead. Prior to this time the negotiations between the parties had resulted in no complete agreement.

The trust officer asked Mr. Brown to bring his copy of the proposed agreement to the bank so that another copy could be made for both parties to sign. At that time Mr. Smith was out of town. Upon his return, on March

414

3d, an appointment was made with the bank people to meet on Saturday, March 4th, and sign the written memorandum of agreement. They were to meet at the bank at noon to sign two copies. On arriving at the bank at noon on March 4th, the bank was closed and had been so for two hours. No agreement was signed. Nothing had been done in pursuance of its terms. This receivership followed.

The unsigned memorandum of agreement is in evidence, but the schedule referred to in it as Schedule A was apparently never prepared.

### Conclusions of Law.

■ 1. The initial relationship between the bank and the plaintiff was that of debtor and creditor in the usual course of the commercial banking business, and such relationship continued until the closing of the bank, unless changed by agreement of the parties.

■■ 2. The plaintiff rests its case upon the contention that the original arrangement was changed to a trust by contract between the plaintiff and the bank just before it closed. I consider there was no contract concluded between the parties, and that for that reason the original status of the plaintiff as a depositor or creditor remained unchanged.

Where a written contract is contemplated, no contract comes into existence until the writing is signed. An agreement intended to be in writing, as this was, is not complete and binding upon the parties until executed.

On this point the leading case is Mississippi & D. Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, 1066, 41 Am. St. Rep. 545, in which former Chief Justice Emery, in a learned and exhaustive opinion, many times referred to and followed, notably in this circuit, laid down the following rules covering a situation where parties negotiate and it is claimed that a contract is arrived at before a written agreement is signed:

"From these expressions of courts and jurists, it is quite clear that, after all, the question is mainly one of intention. If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument, and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract. If, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed.

"In determining which view is entertained in any particular case, several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing, whether it is of such nature as to need a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract." General Motors Corporation v. Abell (C. C. A.) 292 F. 922; Barber-Colman Co. v. Magnano Corp. (C. C. A.) 299 F. 401; Burwell et al. v. American Coke & Chem. Co. (C. C. A.) 7 F.(2d) 435; Gilbert's Patents v. Smith et al. (D. C.) 30 F.(2d) 296 (all the above cases are in this circuit); Elkhorn-Hazard Coal Co. et al. v. Kentucky River Coal Corporation (C. C. A.) 20 F.(2d) 67.

This is not a case of arriving at a full agreement and preparing a draft of it as a "convenient memorial." The parties had not come to a mutual understanding before the drafts were prepared. The final proposal of the bank was, in substance, that they should enter into the written contract which was submitted. The second contract submitted was satisfactory to the plaintiff. The plaintiff's officers now speak of the draft of contract as a proposal, which was accepted by them; the object being to show that they came to an agreement creating the alleged trust in spite of the nonexecution of the written contract. It is clear, however, that it was intended and expected at the time to create the contract and give it life by signing it. The vote of the plaintiff's executive committee authorized the treasurer to "complete the agreement with the People's-Ticonic Bank." The draft of the contract had been gone over and was acceptable. To be "completed" it had only to be signed and the schedule to be attached. Neither having been done, the intention of the parties was not carried out, and there was no enforceable contract.

Plaintiff's counsel directs attention to a paper called a statement of agreed facts, prepared and signed by the officers of the plaintiff above referred to, who have testified, and by the president and trust officer of the bank. This statement of facts surrounding the transaction between the parties was prepared and signed after the bank closed and just before a conservator was appointed. It contains a clause reading: "Since there is no question as to the agreement being definitely presented and accepted by parties competent to represent both the bank and the State Association, we ask that the trust agreement be made operative on the date above mentioned, February 28th, 1933."

This statement was prepared to be presented to the Comptroller of the Currency with the object of inducing him to authorize a priority payment by the receiver to the plaintiff of the $17,000 in question. It was a signed statement which might be used to contradict any previous testimony any of the signers had given at the trial, but apparently is not otherwise useful in this case. The assumption made that there is no question about the agreement between the parties would have no possible effect on the legal interpretation of the situation as developed by the evidence. It was not intended to be the execution by the bank of the unsigned contract; nor could it have had that effect.

The burden of proof here is on the plaintiff to show the existence of a contract. Mississippi & D. Steamship Co. v. Swift, supra.

The National Bank Act (12 USCA § 21 et seq.) controls the winding up of the affairs of an insolvent national bank, and all doubts are to be resolved in favor of the receiver, who is the trustee for general depositors. Cook County National Bank v. U. S., 107 U. S. 445, 2 S. Ct. 561, 27 L. Ed. 537; Schuyler v. Littlefield, 232 U. S. 707, 34 S. Ct. 466, 58 L. Ed. 806.

3. The proposed written contract, even if signed and if a sum of money had been turned over to the bank, did not necessarily then create a trust. The term "trust" was used, but that is not conclusive. The draft of contract was poorly worded and its provisions not wholly consistent. It appeared at the trial that some of the officers who were to sign it had opinions of its meaning not warranted by its terms; but the substance of it appears to be that money turned over was to be invested by the bank as the plaintiff should direct. Until invested and for any money not invested the bank was to be obligated to pay 4 per cent. interest and to secure the payment of the principal by bonds; the principal being payable on demand.

It is clear that as to any money not invested this was to be no trust. On the contrary, the definite status of debtor and creditor was established, changed from the previous relationship only in that the creditor who was previously unsecured became a secured creditor and was to be paid interest. The bank was to have the use of the money. Swan v. Children's Home (C. C. A.) 67 F.(2d) 84.

If any investment should be made at the direction of the plaintiff, it would seem that the property thus purchased would be the property of the plaintiff, and that as to such the bank might as well be considered a bailee as a trustee. But that is not important, as the transaction did not reach that stage. Up to the time of any purchase of securities under this clause, the relationship of debtor and creditor necessarily continued.

4. In any event, however, there can be no priority payment to the plaintiff here, because there was never placed in the hands of the bank as supposed trustee any property which can be identified and traced to the receiver's possession and which increased the funds under his charge to be distributed to general creditors. The burden of proof rests upon the plaintiff to trace the alleged trust fund into the assets in the hands of the receiver of the insolvent bank.

Where the cestui que trust cannot point out specific trust property in the hands of the receiver, he must, in order to follow the trust property, show that it or its proceeds went into some specific fund or into some specific identified piece of property which came into the hands of the receiver. It is not sufficient merely to trace the trust property into the general estate of the bank.

These propositions are well established by numerous authorities. Many of them are collected in 82 A. L. R. page 52, and following.

The case of Blakey v. Brinson, 286 U. S. 254, 52 S. Ct. 516, 76 L. Ed. 1089, 82 A. L. R. 1288, seems to me also decisive of the instant case.

The following is quoted from Keyes v. Paducah & Ill. R. Co. (C. C. A.) 61 F.(2d) 611, 612, 86 A. L. R. 203: "The first question to be decided is whether the fund deposited with the bank is a trust fund, either because it is a special as distinguished from a general deposit, or because it must be construed as a trust by reason of its being a deposit for a specific purpose. If a trust fund, the deposi-

tor is entitled to preferential payment as against general creditors, providing the deposit augmented the bank's funds coming into the hands of the receiver, and providing the money can be traced into his possession. The doctrines of augmentation and tracing are, however, to be considered only if the trust relationship exists; otherwise they are unimportant." Empire State Surety Co. v. Carroll County (C. C. A.) 194 F. 593.

The plaintiff, in common with many other creditors of the bank, has unfortunately suffered a loss by its failure. The distribution of the assets of the bank in the hands of the receiver is governed by the federal statute. The burden upon the plaintiff here to show that he is entitled to any preference over general creditors has not been sustained. It follows that the bill must be dismissed.