**UNITED STEELWORKERS OF AMERICA, Appellant,**

v.

**CCI CORPORATION, a corporation, Appellee.**

**No. 9629.**

United States Court of Appeals
Tenth Circuit.

April 25, 1968.

Rehearing Denied June 26, 1968.

Rep. 63–65 Transfer Binder) ¶ 16,720, at p. 21,648 (1963), on which National relies.

Chris Dixie, Houston, Tex. (Maynard Ungerman, Tulsa, Okl., and Bernard Kleiman, Pittsburgh, Pa., were with him on the brief), for appellant.

Carl D. Hall, Jr., of Hall & Sublett, Tulsa, Okl., for appellee.

Before LEWIS and HILL, Circuit Judges, and CHRISTENSEN, District Judge.

DAVID T. LEWIS, Circuit Judge.

Finding that the appellee-plaintiff, CCI, had been damaged in the amount of $18,824.15 through breach of its collective bargaining contract by appellant-defendant, Steelworkers, the District Court for the Northern District of Oklahoma entered judgment accordingly pursuant to jurisdiction under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The Steelworkers appeal, contending that the trial court erred in finding that a binding contract existed between the parties; erred in finding that any such contract was breached; and erred by applying an improper measure of damages.

The Steelworkers had represented CCI's production employees continuously since the execution of an initial collective bargaining agreement in 1961. The contract was renewed in 1963 for a two-year period expiring on November 11, 1965, but negotiations for a further renewal of the contract between the parties broke down and at midnight November 10, 1965, the Steelworkers struck and established a picket line. One month later, on December 10, the parties met and completely settled their dispute, reaching, according to the testimony of

both the negotiator for CCI and the representative of the Steelworkers, a recognized verbal agreement. The threshold question presented to the trial court was whether the parties intended the verbal agreement to be immediately effective and binding or whether the contract was not intended to be enforceable until its terms were embodied in a signed written contract. Subjective or mutual intent is a question of fact to be determined from all probative circumstances and, since the trial court found that the parties intended to be bound by the oral contract, the threshold appellate question is whether such finding is clearly erroneous. Rule 52(a), Fed.R.Civ.P. We hold the finding to be amply supported by the evidence.

We readily recognize, as union counsel argues, that labor contract negotiation bears the coercion of statute, that negotiators often give and take on minor issues to supply the required continuity of bargaining and anticipatory to the main issues, and that it would indeed frustrate collective bargaining if the law silently closed a deal while the negotiator was angling for some other point. But collective bargaining, while it has distinctive considerations, is premised upon good faith not only at the bargaining table but, in the full contemplation of the Act, in the commitments there made, relied on by the parties and acted upon by them. Thus, when bargaining is terminated and an agreement reached, the intent of the parties may be tested by the application of classic contract law, a principle recognized by the National Labor Relations Board in considering a § 8(a)5 violation for refusal to sign an agreed verbal contract. In the case at bar, the actions and statements of both parties point to the existence of a binding verbal contract.

After the December 10 meeting, in the late afternoon, Mr. Vanya, the Steelworkers' representative, called Mr. Manasco, the CCI representative, and told him, "We have an agreement. The employees have accepted it. I am pulling the pickets." This was done. On Monday, December 13, the employees returned to work and CCI effectuated the wage increases and all bargained-for modifications. Later in December CCI submitted to the Steelworkers a written contract for signatures containing the continuing provisions of the 1963 contract and employing the language agreed to at the bargaining table to the extent the basic contract was changed.

When the union failed to respond to the draft tendered to it by the company in December, CCI, on January 10, 1966, sent to the Steelworkers a letter requesting that the parties get together to sign the contract so it could be printed and distributed to the employees. The letter advised the union that CCI was administering and applying the terms and conditions agreed upon during negotiations and would continue to do so "as though the formality of signing had already occurred." The union asserts that this is inconsistent with the CCI's position that the oral contract was binding, but the contrary appears to us to be a more logical interpretation. What it serves to emphasize is that signing was a mere formality and not determinative of the existence of a binding agreement. CCI's conduct as well as its assertions is consistent with this position. The contract was signed, without change, on January 31, 1966, dated and specifying its effectiveness to be December 10, 1965.

There was also evidence that the Steelworkers considered the oral agreement binding. On February 25, 1966, union representative Vanya signed and filed a grievance on behalf of an employee alleging a violation of the new agreement arising out of a January 3 occurrence— this of course being prior to the actual signing.

We are not now confronted with a case where "no one really believed that the parties would be bound until the contracts were fully executed and delivered," Genesco, Inc. v. Joint Council 13, United Shoe Workers, etc., 2 Cir., 341

F.2d 482, 486, or where there has been an agreement on "principle" only with the written form to follow. 341 F.2d at 486. We have, rather, an earlier basic written contract, modified in part by complete verbal understanding and later signed in accord with such understanding, and acted upon by both parties as if immediately effective upon verbal agreement. Although a written contract was contemplated,[1] the trial court was not clearly erroneous in holding that a binding verbal contract was intended by the parties pending a written formalization of their agreement.

The Steelworkers further contend that no valid verbal contract was existent because its representative, Vanya, lacked authority under provisions of the Steelworkers Constitution to finalize an agreement.

In enacting the Labor Management Relations Act of 1947, Congress provided that the actual fact of authorization or subsequent ratification would not be controlling of agency questions.[2] This has been properly construed as opening the way for application of general rules of agency and particularly the rules of apparent authority. International Long-shoremen's & Warehousemen's Union v. Hawaiian Pineapple Co., 9 Cir., 226 F.2d 875, 880.[3] The trial court found that Vanya had apparent authority. The finding is supported in the evidence. Manasco testified that the international officers of the union had never signed the company's agreements and that at no time was the company informed that approval of the international officers was necessary or that any additional action had to be taken by the international union prior to the agreement's becoming effective. Representative Vanya's conduct and handling of negotiations gave every indication of authority.

The parties' contract in each of the years 1961, 1963 and 1965 contained a no strike no lockout provision.[4] On January 28, 1966, CCI was struck and picketed by the Teamsters' Union. On January 31 the first shift of the Steelworkers, due in at 6:00 a. m., refused to cross the picket line although urged to do so by company officials by announcement over the public address system that they, the employees, had a contractual duty to do so. Vanya and his negotiating committee were present at the scene and

1. Note the old but oft-cited language from the case of Mississippi & Dominion S. S. Co. v. Swift, 86 Me. 248, 258–259, 29 A. 1063, 1067, (1894), to the effect that in making a judgment about intent to be bound by an oral contract " * * * several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing, whether it is of such nature as to need a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

2. § 301(e) of the Act, 29 U.S.C. § 185, provides:
   "For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

3. See also Sunset Line & Twine Co., 79 N.L.R.B. 1487, interpreting an identical provision from 29 U.S.C. § 152(13).

4. "The Union agrees that neither it nor any of the employees in the bargaining unit covered by this Agreement will collectively, concertedly or individually engage in or participate, directly or indirectly, in any strike, slow-down, stoppage, or other interference of production or work during the term of this Agreement; and the Company agrees that during the term of this Agreement, it will not lock out any of the employees covered by this Agreement. The Company retains the right to discipline or discharge any employee who violates this provision."

Vanya, when asked by individual Steelworkers as to what to do replied, "This is up to you as an individual." As a result seven men reported for work, one hundred and eighty did not.

■ Although the Steelworkers disavow any union responsibility for the actions of its members we find no merit to the contention. The refusal to cross the Teamsters' line was clearly a breach of contract, NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832, 31 A.L.R.2d 511, and by no stretch of the imagination could the action be termed a wildcat. Vanya told the second shift to report in and the men followed his instructions. We hold the inculpation of the Steelworkers' Union to be clear.

■■ Finally it is contended that the court erred in the determination of damages. The assessment of $18,824.51 totals from loss of profits in the amount of $5,729.02, unabsorbed manufacturing expenses in the amount of $8,111.87, and unabsorbed administrative expenses in the amount of $4,983.62. These findings were based upon documentary evidence and the testimony of W. T. O'Shields, Vice President of Manufacturing for the company, and Wayne Harpster, a Certified Public Accountant of the firm which had been auditing the company's books for the preceding three years. The Steelworkers introduced no evidence either to contravert the plaintiff's damage claim or to assist the court in making the assessment. The damages consisting of loss of profits plus standby overhead expenses—herein referred to as unabsorbed manufacturing and administrative expenses—while having elements of speculativeness, are nonetheless recoverable, United Electrical, Radio & Machine Workers of America v. Oliver Corp., 8 Cir., 205 F.2d 376, where, as here, the elements were proved by competent evidence. And although counsel now attacks with vigor the conclusionary opinions of the expert accountant the appellate contention is subject to the same criticism that is leveled at the witness's

conclusions—that of speculation. We cannot say as a matter of law that the trial court erred in accepting the testimony of the expert as credible and accurate when that court was unaided by the introduction of conflicting or disputing evidence.

■ By motion for new trial made under Rule 59, Fed.R.Civ.P., and for the first time, claim was made that CCI could have mitigated its damage by scheduling overtime to make up for lost production. The contention is extended to appellate argument. Admittedly, additional evidence would be required to premise any validity the claim might have. It seems sufficient to say that such a theory should have been offered and supported at trial and not after judgment nor in this court.

The judgment is affirmed.