ARKANSAS BEVERAGE COMPANY *v.* DR. PEPPER
BOTTLING COMPANY OF LITTLE ROCK, ARKANSAS
WINSTON I. MOODY, SR., AND COCA COLA BOTTLING
COMPANY OF ARKANSAS

5-5382                                             461 S. W. 2d 571

Opinion delivered January 11, 1971

*Robert F. Schlafly* and *Chowning, Mitchell, Hamilton & Chowning,* for appellant.

*Rose, Barron, Nash, Williamson, Carroll & Clay,* for appellee.

CARLETON HARRIS, Chief Justice. This appeal challenges, on legal and factual grounds, the adverse findings and decree of the Pulaski Chancery Court in a suit filed by appellant, Arkansas Beverage Company,

distributors of Pepsi-Cola, an Arkansas corporation with home offices in St. Louis, against Dr. Pepper Bottling Company of Little Rock, its president and sole stockholder Winston Moody, and Coca Cola Bottling Company of Arkansas. Suit was filed against Dr. Pepper of Little Rock and Moody on April 2, 1969, and Coca Cola Bottling Company of Arkansas, hereinafter called Coca Cola, was joined as a defendant by an amended complaint filed on May 29, 1969. The complaint against Dr. Pepper of Little Rock and Moody sought specific performance of a purported contract made by appellant with Dr. Pepper of Little Rock for the sale of the company, and for a mandatory injunction. The complaint against Coca Cola will be subsequently discussed.

Dr. Pepper of Little Rock was a bottling plant operating as the franchisee of two bottlers' license agreements issued by Dr. Pepper, a Colorado Corporation, with headquarters in Dallas, Texas, hereinafter referred to as Dr. Pepper of Dallas. These agreements pertained to soft drinks known as Dr. Pepper and Dietetic Dr. Pepper, and granted to Dr. Pepper of Little Rock the exclusive right and license to carbonate, bottle, sell, and distribute these drinks in the Central Arkansas Counties of Pulaski, Saline, Lonoke and parts of Prairie and White.

It appears that during the months of October and November of 1968, appellant, Arkansas Beverage Company, hereinafter referred to as ABC, through its president, M. G. Biehl of St. Louis, and its local general manager, H. J. "Bob" Tucker of Little Rock, conferred with Moody relative to a possible purchase of Dr. Pepper of Little Rock. Moody asked a total of $600,000.00 to be paid over a period of years and indicated a desire that he be hired as a consultant to the company. This proposal was agreeable and Mr. Biehl submitted it to the ABC Board of Directors on December 5, 1968. The board authorized him to present it to Moody, obtain his approval, and resubmit it to the ABC board for final acceptance. This offer was communicated to Moody but after extended discussion, he

rejected it on the advice of his accountant for fear of adverse tax consequences.

Biehl reported Moody's rejection to the ABC board and there was no further contact between Moody and ABC until on or about February 21, 1969, when Moody, after talking with Tucker, signed the following statement prepared by Tucker in his own handwriting:

"If the offer of 12/10/68 can be reinstated, plus appreciation and less depreciation, I will sell.

It must be noted, figure for item No. 48 is out of line, interest on vendor notes is not included in liabilities and I reserve the right to purchase the Cadillac at book value."

Mr. Tucker sent the statement to Biehl, who after meeting with the ABC board, was directed, with Tucker, to notify Moody, and instruct the company's counsel to prepare formal contracts and authorize the officers of the company to execute them. This was done and on March 13, representatives from Dr. Pepper of Dallas, helped Tucker fill out the application forms to transfer the licenses from Dr. Pepper of Little Rock to ABC. This application upon completion was forwarded to Dallas. Relative to this application, Mr. Summers, Southwest Division Manager of Dr. Pepper of Dallas, reported to his company that he could not recommend that appellant be given the franchise until ABC positively agreed to three additional requirements. On March 21, Moody called Joe K. Hughes, Vice-President for marketing services and Chairman of the Franchise Department of Dr. Pepper of Dallas requesting that he hold up action on ABC's license application since Coca Cola had evidenced an interest in buying Dr. Pepper of Little Rock.[1]

On March 25, Coca Cola and Moody signed an agreement for the purchase of all of Moody's stock in

---

[1]Coca Cola of Arkansas had about a year previously, offered to buy the company but this offer was rejected by Moody because of insufficient price.

Dr. Pepper of Little Rock, Tucker was informed by Moody of this agreement on the same day. Dr. Pepper of Dallas subsequently returned the license application of ABC, advising that the franchise had been granted to Coca Cola. Coca Cola subsequently offered to sell ABC the assets of Dr. Pepper of Little Rock, exclusive of the franchise agreements, but this offer was rejected. Thereafter, Coca Cola liquidated Dr. Pepper of Little Rock and sold many of its assets to third persons. As a result, ABC, alleging the contract with Moody and Dr. Pepper of Little Rock, amended its complaint to include Coca Cola, and further prayed for the issuance of a mandatory injunction requiring the preservation of the business and good will of Dr. Pepper of Little Rock as operated by Dr. Pepper or Coca Cola.

The chancellor found that there was never a contract, and if there had been, that it could not be the subject of specific performance. From these findings, appellant brings this appeal.

The evidence in this trial was voluminous and fills five large transcript volumes. Testimony concerning several different facets of the case, and the argument relative thereto, will not be discussed since we are of the view that the parties never finally agreed upon several matters that were essential to the completed contract.

Since the statement of February 21, 1969, signed by Moody refers to a reinstatement of the offer of December 10, 1968, it is first necessary that we examine the letter containing that offer. The letter commences by advising that appellant proposes to pay Dr. Pepper of Little Rock a total of $600,000 over a fifteen year period, paying $381,870 for guaranteed receivables, inventories, bottles and cases, pre-paid insurance, fixed assets of the plant and office equipment, trucks, automobiles, and vending machines and equipment. Franchise rights and good will would also be included. Of the $600,000, $381,870 would be paid as follows: $120,000 in cash, $65,000 by ABC's assumption of Dr. Pepper of Little Rock's term debt, and $196,870 by appellant's promissory note in that amount, payable with 8% inter-

est on the declining balances in equal annual installments for fifteen years, commencing December 31, 1969. It was mentioned that the $120,000 could be paid by $30,000 in cash at closing, plus appellant's note for $90,000 payable on January 3, 1969, which would "spread the initial cash payments over two years". Two paragraphs are very pertinent to the conclusion we have reached in this case. Paragraph number two reads as follows:

"This proposal is subject to preparation of formal contract papers and final approval by our Board of Directors. However, our Board *favors the transaction in principle* and authorized me to find out if the following proposal is acceptable to you. If it is, *we would submit a formal contract to you and to our Board promptly for action.* Of course, *the deal would be conditioned on our Company getting approval for the new franchise, which should not be a problem.*"[2]

The final paragraph of the letter reads as follows:

"Please initial one copy of this letter as *your agreement in principle and we can proceed with preparation of the formal contract papers so that final closing can be a[e]ffected at the earliest possible date.* [our emphasis.]"

Appellant offered testimony that Moody had told other bottlers, at a bottlers' convention in Hot Springs, that Dr. Pepper of Little Rock had been sold to appellant; however, Moody offered witnesses who testified, in effect, that he was only engaged in negotiations for a sale to ABC. Appellant argues that Moody used its offer as leverage to obtain a better offer from Coca Cola, a company that had previously made a much less substantial offer, and when he obtained the price and conditions that he desired, chose to ignore his existing contract with appellant. It may be that Moody took advantage of the offer from ABC to acquire a better bargain from Coca Cola—but that is not the question at issue. If he were only negotiating with appellant, he

---

[2]All italicized portions denote our emphasis.

*certainly had the legal right, even if it be considered* that he did not have an ethical right, to mention the offer from ABC.

It is pointed out by appellant that Moody acquainted Tucker with the details of his business. Actually, in reviewing testimony emphasized by appellant, relative to Moody's furnishing an inventory of his business, supplying financial statements, and taking a representative of the appellant company on tour through his plant, furnishing him with information about the capabilities of the plant employees, we find no acts inconsistent with *negotiating* a sale. Certainly, a purchaser seriously considering an expenditure of $600,000, would want to be acquainted with those facts. For that matter, it appears unquestionable that Moody thought he would probably be selling to ABC, not having any additional offers at the time the discussions concerning the sale commenced, and he could well have left the impression with some of the witnesses that it was his intention to sell to ABC. But we again reiterate that there is a distinct difference between negotiating for a sale, or even planning on making a sale—and in entering into a contract for such a sale.

We have mentioned that a purchaser would demand complete knowledge of the operations of a business before paying $600,000 for it; similarly, a seller of such a business would likewise be concerned with details. With this thought in mind, it is pertinent to make a determination of whether there were important details, or to state it in another way, substantial matters, that were left unanswered, or not agreed upon, in the formal contract prepared by appellant, and brought to Little Rock by the president of ABC, Marc G. Biehl, prior to learning of Moody's sale to Coca Cola. The proposed contract is rather lengthy, and we will only make mention of important matters that were not mentioned in the letter of December 10, 1968, or had not been agreed upon, by the parties. Paragraph two of the proposed contract of the sale of the assets[3] provides that the pur-

[3]There were two proposed contracts prepared by ABC, one for the sale of the business, and the other for personal services of Moody.

chase price of $381,870 would be adjusted by the amount that the bottles on hand on March 31, 1969, was more or less than 10,000 cases, valued at fifty cents per case. Mr. Tucker admitted that neither ABC's "offer of 12/10/68" nor Moody's "offer of 2/21/69" contained any mention of an adjustment to the purchase price depending upon the extent by which the bottle inventory was more or less than 10,000 cases. Paragraph eight of the contract provides that personal property taxes for 1969 on the assets to be purchased by appellant would be charged one-fourth to Dr. Pepper and three-fourths to appellant in closing adjustments. Moody testified that he did not so agree, and both Tucker and Biehl testified that this provision for the allocation of these taxes was not contained in the offer of February 21, 1969, and was never discussed between the parties. Paragraph ten of the proposed contract provides that Dr. Pepper of Little Rock would reimburse appellant on demand for the amount of any receivables which had not been collected by appellant within 90 days from the due dates. Moody testified that he did not so agree and Biehl admitted that the "offer did not contain this provision and, in fact, it was never discussed between the parties". Moody said that had the formal written contract been submitted to him for approval, he would have insisted on at least six months to collect delinquent accounts before they were charged back to him, and Biehl stated that he did not know whether ABC would have agreed to a six months collection period before charging delinquent accounts back to Moody; that this point would have had to be negotiated between the parties. Paragraph sixteen provided that Dr. Pepper of Little Rock would indemnify appellant for any liability resulting from Dr. Pepper's failure to comply with the Arkansas Bulk Sales Law. Both Biehl and Moody testified that this provision was not contained in the "offer" and, in fact, had never been discussed by the parties. Paragraph five of the proposed employment agreement provided that during the seven year period of employment of Moody by appellant, the former would not directly or indirectly, engage in any type of soft drink business, either individually or as a partner or employee,

*officer, director, or stockholder of a corporation,* except for services to appellant, and that a violation of this provision would relieve appellant from any further obligation to pay any balance of the $70,000 owed to Moody under said employment contract. Moody testified that the provision for his services as a consultant actually was part of the proposed purchase price for which appellant hoped to take a current income tax deduction, and both Biehl and Moody stated that the non-competition provision was not mentioned in Moody's offer of 2/21/69 and had never been discussed between the parties. A number of other minor items are in the same category, but we have mentioned these as matters of importance to the culmination of the contract, and which were not included in the offer previously mentioned.

Probably the most important item was the provision that Moody would obtain from Dr. Pepper of Dallas new license agreements for the territory served by Dr. Pepper of Little Rock for the drink known as Dr. Pepper and all other products of Dr. Pepper Company then sold by Little Rock Dr. Pepper; also, all other products which the local company was then authorized to sell and bottle from National NuGrape Company, Atlanta, Georgia. The proposed contract brought to Little Rock by Biehl set out that the seller agreed to sell to appellant, *inter alia.*

"(c)  All trademarks, trade names, franchise rights and good will associated with said bottling business in the territory described in paragraph 13 and wherever else Seller conducts its business."

This proposal, if signed by Moody, bound Dr. Pepper of Little Rock to sell something that it had no right to sell, and would have obligated Moody to grant rights which were not his to grant, for admittedly, the matter of granting franchise rights was the sole prerogative of Dr. Pepper of Dallas. To say the least, it would be unusual for any businessman to bind himself to perform an act clearly beyond his control. The obtaining of the

franchise rights was the principal reason for appellant's desire to make the purchase, and Biehl made it very clear that his company would not be interested in acquiring the properties of Dr. Pepper of Little Rock unless franchise rights could be obtained. In fact, appellant was subsequently offered the opportunity to purchase all assets of the Little Rock company, exclusive of the franchise, and declined to do so. While it appears, though not at all definite, that Dr. Pepper of Dallas would, at the time, since there was no other applicant, have approved the granting of franchise rights to appellant, there is a clear indication that further negotiations would likely have been necessary; at any rate, Moody could not be expected to warrant that franchise rights would be granted.[4]

In addition to the matters mentioned in the proposed contract that were not covered in the December 10, 1968, letter, there were two other matters that definitely appear to have been subject to further negotiations before agreement could have been reached. The first of these relates to collateral to secure the note which was to be given by appellant to Moody. Moody testified that he requested security. This was denied by Biehl and Tucker. But admittedly, Moody had requested that Mr. Daniel Schlafly, chairman of the board of ABC, endorse ABC's note for the balance of the purchase price. Tucker reported to Moody that Mr. Schlafly would not do so, and he said that ended the discussion about security or collateral. Moody testified that he would have never executed a contract without some form of security, and such a requirement on the part of Moody would appear, not only reasonable, but, from his standpoint, almost essential. When interrogated as to the security that ABC would have given Moody, Tucker replied "That would have been up to our board, sir, by mutual agreement with Moody for security". He then stated *"There would have been security of some*

---

[4]Under our view, we do not reach the point but it would be interesting to see what would happen if appellant prevailed in this litigation, and Dr. Pepper of Dallas gave franchise rights to some bottler, not presently a party to any of these proceedings.

*sort. Mr. Moody wouldn't have accepted it without some sort of security".* [our emphasis.] It is interesting to note that following a recess for lunch, Tucker again took the stand and on re-direct examination indicated that the security he was talking about was the note itself. "I mean a piece of paper, the rate of interest, something tangible that he had a note and this could be assigned to his heirs. That is the type of security I am speaking of." We certainly cannot say that the court's finding that Moody requested security, and that this matter had not been agreed upon, was against the preponderance of the evidence.

There is no provision in the proposed written contract that appellant would pay any rent on the building occupied by Dr. Pepper of Little Rock, said building being owned by Moody as an individual. If the sale had been consummated, it would have been necessary for appellant to have continued to occupy that building until such time as the bottling of Dr. Pepper products could have been moved to appellant's plant in an orderly fashion. Moody testified that he would not have permitted appellant to occupy the building without the payment of rent; in fact, he testified that he would have expected to receive at least $800.00 per month. It is not disputed that rent was never mentioned between the parties. There was still another matter that would have required specific agreement, which was not included in the proposed contract brought by Biehl to Little Rock, *viz,* Moody was not given any credit for prepaid insurance and all three parties testified that Moody, on December 12, 1968, had requested that he be given that credit.

There is no reason to discuss the allegations against Coca Cola, for any possible liability of that appellee must be based upon the premise that ABC and Dr. Pepper of Little Rock had entered into a binding contract. The testimony as to the knowledge held by officials of the local Coca Cola company relative to Moody's negotiations with appellant is in dispute; Coca Cola did obtain the advice of its attorney before proceeding

with the closing, but under our views, heretofore expressed, Coca Cola's actions in the controversy are of no moment.

To summarize, we agree with the finding of the chancellor that no contract was entered into between the parties; even if in doubt, we certainly could not say that his findings were against the preponderance of the evidence.

The governing law is aptly set out in the Federal case of *American Bentonite Corporation* v. *Clark Equipment Co.* 43 Fed. 2d 392 (District Court, W. D. Michigan, S. D.), which bears some factual similarity to the present litigation. There, the court quotes from the well recognized and much cited case of *Mississippi Steamship Co.* v. *Swift,* 86 Me. 248, 29 A. 1063, 1066, 41 Am. St. Rep. 545, in mentioning the factors that should be taken into consideration in determining whether a definite contract has been entered into. From the opinion:

"If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument, and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract. If, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed. In determining which view is entertained in any particular case, several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing, whether it is of such nature as to need a formal writing for its full expression, whether

it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

In the case before us, certainly this contract is of that class usually found to be in writing, is of such a nature as to need a formal writing for its full expression since it contains many details, the amount involved is large, the negotiations themselves indicate that a written draft was contemplated as a final conclusion, and a written draft is proposed by the letter of December 10. In *Smith* v. *School Dist. No. 89*, 187 Ark. 405, 59 S. W. 2d 1022, this court quoted 13 C. J., § 86 as follows:

"An acceptance, to be effectual, must be identical with the offer and unconditional. Where a person offers to do a definite thing, and another accepts conditionally or introduces a new term into the acceptance, his answer is either a mere expression of willingness to treat or it is a counter proposal, and in neither case is there an agreement."

Paragraph two of the letter of December 10, 1968, quoted at the outset of this opinion, is more persuasive. To reiterate, that language states:

"This proposal is subject to preparation of formal contract papers and final approval by our Board of Directors. However, our Board favors the transaction in principle and authorized me to find out if the following proposal is acceptable to you. If it is, we would submit a formal contract to you and to our Board promptly for action. Of course, the deal would be conditioned on our Company getting approval for the new franchise, which should not be a problem."

Moody is then told to initial two copies of the letter as his agreement in principle.

It would certainly appear that, if the shoe were on the other foot, and appellant were contending that no definite agreement had been reached, and that it was not bound by its letter of December 10, 1968, to carry out a purchase of Dr. Pepper Bottling Company of Little Rock, we would have to agree that there was merit in such a contention. The inclusion of provisions, in the proposed contract brought to Little Rock by Biehl, not mentioned in the letter of December 10, as well as the failure to mention important matters that would necessarily arise in closing a sale, we think, clearly shows that a complete and finalized agreement, or a "meeting of the minds" had not taken place between the parties.

Affirmed.