Millard P. BUCK, Plaintiff in Error,

v.

Robert D. CALDWELL, Defendant in Error.

No. 38210.

Supreme Court of Oklahoma.

June 9, 1959.

Hamilton & Kane, Pawhuska, and Hayes McCoy, Bartlesville, for plaintiff in error.

Charles W. Selby, and Denzil D. Garrison, Bartlesville, for defendant in error.

BERRY, Justice.

The parties occupy the same relative position here as in the trial court and Millard P. Buck, plaintiff in error, will therefore be referred to · herein as "plaintiff" and Robert D. Caldwell, defendant in error, will be referred to as "defendant". When referred to collectively, plaintiff and defendant will be referred to as "partners".

On August 26, 1953, plaintiff and defendant were engaged as partners in the practice of architecture at Bartlesville, Oklahoma. On said date partners reached an agreement with Frank McGuire and his wife, Juanita, relative to building an office building on a vacant lot that the McGuires owned, which lot was located in the business section of ·Bartlesville. The agreement was evidenced by four separate written instruments all of which were under date of August 26, 1953. First, an instrument denominated "The Standard Form of Agreement between Contractor and Owner for Construction of Buildings", between partners and the McGuires wherein it was provided that partners would immediately commence building an office building on said lot and that the building would be substantially completed within sixty days; that upon completion of the building the McGuires would pay partners $10,800 or as an alternative execute an installment note in the sum of $14,688, including interest, payable in 144 monthly installments of $102 each beginning October 15, 1953, which note was to be secured by a mortgage "on said premises". Second, a written instrument denominated "lease" under date of August 26, 1953, between partners and the McGuires. It was provided therein that the McGuires owned the lot above referred to and that the McGuires desired to lease same to partners; that partners (who are referred ·to in the lease as "renters") agreed to pay to the McGuires as rentals for said lot $14,688 in 144 monthly rental payments of $102 each, beginning October 15, 1953; that partners would pay ad valorem taxes falling due on the lot for the years 1954 to 1965, inclusive, and would insure the building (to be built) for not less than $10,000, and if the building was damaged or destroyed, partners would repair or restore same; that if partners failed to furnish insurance, the McGuires could do so and the cost thereof would constitute a lien on the "building and/or premises"; that partners were granted an option to extend the lease for an additional ten-year period, the rental to be determined by two of three people to be named in manner arbitrators are usually named; that partners should have right to sublet "any part or portion of" building; that partners should have right to install machinery in building and should not permit demised premises to become subject to liens or encumbrances. Third, an "Installment Note" in which the McGuires were the payors and partners were the payees, in the principal amount of $14,688 with interest at maturity, which note was payable in equal $102 installments beginning October 15, 1953. Fourth, a "Mortgage of Real Estate", in which the McGuires were the mortgagors and partners were the mortgagees, covering the lot (real estate) which secured the referred-to promissory note.

Following completion of the two-story office building that partners and the McGuires contemplated would be built in accordance with the referred-to contract and lease, partners undertook to agree upon a dissolution of their partnership. After they had failed to agree, Mr. Shaw, a lawyer who represented partners, suggested that a dissolution of the partnership might be amicably brought about under a plan whereby the properties of the partnership would be classified and placed in three different categories, with each partner submitting sealed bids covering the properties included in each category. After partners had made known to Mr. Shaw that they were agreeable to dissolving their partnership under such a plan, Mr. Shaw prepared a written

instrument which will hereafter be referred to as "bid" and submitted a copy to plaintiff and to defendant. In the first category of the bid, or "Bid No. 1", a bid was called for on certain real estate that the partners owned, the description of which did not embrace the McGuire lot. Plaintiff bid $1,199.99 for the defendant's interest in said property and defendant bid $1,160 for plaintiff's interest. In the second category of the bid, or "Bid No. 2", a bid was called for on the "undivided one-half interest of (the other partner) in the lease of Buck & Caldwell in the building" located on the McGuire lot, subject to outstanding claims incurred in building the building which were stated in the bid to be $8,604.61 but which claims, because of payments, had been reduced to around $8,000 when the bids were made. On "Bid No. 2" plaintiff bid $4,999.99 and defendant bid $3,640. In the third and last category of the bid, or "Bid No. 3", a bid was called for on "the one-half interest (of the other partner) in all of the equity of Buck & Caldwell in all cash in banks including Union National Bank and First National Bank in Bartlesville, Oklahoma, and Home Savings and Loan Assn. of Bartlesville, all office furniture, fixtures, equipment, instruments, tools, patterns, materials, supplies, books, catalogs, correspondence files, samples, magazines, literature, drawings, sketches, renderings, photographs, blueprints, plans, designs, notes and accounts receivable, specifications, shop drawings and other intangible assets". On "Bid No. 3" plaintiff bid $2,600 and defendant bid $9,200. The McGuire note was the only note owned by the partnership when the bids were made, which note appeared on the trial balance and balance sheet of the partnership at a value of $10,188. It will be noted that under the bid arrangement, plaintiff acquired bid items 1 and 2 and defendant acquired bid item 3.

Immediately following the opening of the bids on November 17, 1954, defendant executed an instrument denominated "Sublease" wherein it was recited that on August 26, 1953, a certain "Indenture of Lease" was made between the McGuires and partners covering the McGuire lot which was described, which lease extended from August 15, 1953 to October 15, 1965 with the right to extend same as provided therein; that defendant as one of the lessees "assign and set over unto (plaintiff) the other of said lessees, all rights under said lease". On the same date plaintiff executed an instrument denominated "Bill of Sale" wherein it was recited that plaintiff assigned to defendant certain intangibles and chattels, which property was described therein precisely as in "Bid No. 3". The wording of the description therefore included the word "notes". It appears that on said date defendant executed and delivered to plaintiff a quitclaim deed covering the property described in "Bid No. 1".

Within a short time after November 17, 1954, plaintiff and defendant discovered that defendant believed that he had by virtue of making the highest bid for property described in Bid No. 3, acquired the McGuire note heretofore referred to and that plaintiff believed that as the highest bidder for property described in Bid No. 2 he had acquired said note. This lawsuit resulted.

In his petition, plaintiff, after stating the substance of the transaction hereinbefore outlined, asserted that by virtue of being the high bidder on property placed in the category following "Bid No. 2," he became the owner of the McGuire note; that the McGuires should be enjoined from making payments on said note to anyone except him; that defendant should be enjoined from demanding payments of the McGuires under the note and that defendant should be required to surrender the McGuire note and mortgage to him. In his answer, defendant alleged in substance that the partnership had not been dissolved and that an accounting had not been had and for said reason plaintiff's action should be dismissed or held in abeyance until the partnership was dissolved.

At the trial of the case the facts heretofore referred to were developed and these additional pertinent facts were also developed. The cost of the building which partners built on the McGuire lot was $18,-

600. At the time of the trial, space other than that occupied by the defendant was renting for $400 a month. Plaintiff estimated the probable rentals which would accrue over the twelve-year period remaining after November, 1954, at $52,000 and that the expense of upkeep of building, including ad valorem taxes and insurance, would aggregate approximately $26,400. The defendant fixed this expense at a lower figure. Plaintiff and Mr. McGuire testified that they considered that partners owned building and defendant testified that he considered that he and plaintiff only had a lease on building. Plaintiff testified that upon making bid on "Bid No. 2" he considered that he was buying all of the partners' interest in the building, including the McGuire note and mortgage and there was testimony that Mr. Shaw considered that Bid No. 2 included said note and mortgage. Defendant testified that he relied upon the language used in Bid No. 2 and Bid No. 3. and therefore was of the opinion that Bid No. 2 only covered the "lease" on the building and that Bid No. 3 covered the McGuire "note". Defendant testified that he bid $9,200 for property included under Bid No. 3, because he believed that the McGuire note was included in the property listed under said bid. Plaintiff testified that if he had been of the opinion that the McGuire note was included under Bid No. 3 he would only have bid "in the neighborhood of $7,000.00 total." The record shows that plaintiff and defendant, in making their bids, each relied upon the partnership trial balance sheet and balance sheet prepared shortly before bids were made. The aggregate amount of plaintiff's bids was $8,799.98. The aggregate amount of defendant's bids was $14,000. The difference is $6,201.02 which difference is indeed great when the net value of the partnership properties is considered. Plaintiff stresses that in most instances the McGuires did not cash partners' checks and partners did not cash the McGuires' checks, which fact plaintiff contends tends to support his contention that there wasn't in fact a lease from the McGuires to partners.

At the conclusion of the trial, the trial judgment summarized the evidence and pointed out the salient and pertinent portions of the evidence. We quote what we believe to be particularly apropos portions of said summary:

"Now, after reading these bids, Bid Number 2 and Number 3, and considering them with all the circumstances and, as indicated here in some of the argument, that what Buck & Caldwell obtained out of this arrangement was a leasehold interest in this building for a period of twelve years and, of course, the McGuires, at the risk of losing their lot, are acquiring this building in twelve years.

\* \* \* \* \* \*

"And now there is no question Exhibit Number 7 (sublease heretofore referred to) is a full assignment of all the interest of Robert D. Caldwell to Millard P. Buck of his interest in that leasehold estate or the lease, I should say.

\* \* \* \* \* \*

"Now, as I read this Bid Number 2, I see Mr. Shaw put in the word 'equity' and he changed it to 'lease'. And I don't think it makes any difference because it means the same probably. That is they don't have any equity in it. They only have a leasehold estate. But he used the word 'lease'. And they have, Buck & Caldwell have had a lease on this building.

"And I think the lease has value separate from this note and mortgage. And it must have. And, as pointed out here yesterday, if each of these instruments didn't have legal significance and they weren't binding then you wouldn't have any agreement, or binding agreement between the parties as between the McGuires on one hand and Buck & Caldwell on the other. So it would have, they all do have significance.

\* \* \* \* \* \*

"And under Bid Number 2, it appears to the Court that all that was included

under that was this lease. And that under this Bid Number 3 it does use the words 'notes and accounts receivable'. Then if you take up Defendant's Exhibit Number A (trial balance) and look up there you see it uses the words 'notes receivable'. Doesn't say 'notes receivable on McGuire note' but says 'notes receivable, $10,188.00'. Now, undoubtedly, the things that are enumerated, or a lot of them enumerated here, are taken out of this list. They were trying to get a list of what the company of Buck & Caldwell owned.

"Now, and I say this for this reason, and I have studied this quite a bit and came to this conclusion: That either Mr. Caldwell was the rightful owner of this note and mortgage under Bid Number 3 or that there was no meeting of the minds and neither one of them owned it and, by this being an equitable matter, the Court should throw out Number 2 and 3, and them then rebid on both of them if they still wanted to do that or they still wanted to be dissolved on the partnership.

"But after I look at all these bids and everything, then go back and look at the trial balance and the balance sheets and the terminology used therein and the relationship of the bid. That says $9200.00. This being an equitable matter, it wouldn't be right for Mr. Caldwell to have this unless he paid for it a reasonable amount. I asked Mr. Buck what he would have paid for it. He said around $7,000.00 and he bid on that. Whether he understood or didn't understand, and what Mr. Shaw thought, and one thing and another, these instruments speak for themselves. The language is governing that is in here.

\* \* \* \* \* \*

"\* \* \* And on this Bid Number 3 Mr. Caldwell bid $9,200.00. And that's even more than Mr. Buck says that he would have given for it even if he had considered the note and mortgage in that item, Bid Number 3. So

it seems fair, equitable, reasonable and conscionable, the whole affair. And it seems clear that that was the intent of the parties, because in the balance sheets they used the same terminology 'notes receivable', in the trial balance and balance sheet. That is Defendant's Exhibit A and Defendant's Exhibit B.

"Of course, I agree with this attorney, (attorney for plaintiff) they would have to be interpreted together \* \* \*."

In the formal journal entry of judgment, the trial court found generally for the defendant and against the plaintiff. From trial court's order overruling his motion for new trial, the plaintiff perfected this appeal.

At the trial of this case, plaintiff's attorney stated plaintiff's position by saying:

"Our philosophy of this lawsuit and evidence all considered that as the parties interested in this bid, Bid Number 2, that the foundation of Bid Number 2, the subject of Bid Number 2, was the building and that thereafter everything that belonged to the building went with the building to the successful bidder of Bid Number 2. That the McGuires' $102.00 per month was not an independent note and mortgage but it was purely a part of the one transaction, as provided by the Oklahoma Statutes, when several contracts by the same parties with reference to the same subject matter are entered into that they would all be taken together. And that there was one contract between the McGuires on the one side and Buck & Caldwell on the other side and that the building was to belong to Buck & Caldwell and then when Buck purchased Caldwell's interest to it that the building belonged to Buck and still belongs to him and will belong to him until the 15th day of October, 1965."

The defendant's position is that there was a lease from the McGuires to partners and that there was a "note" from the

McGuires to partners; that Bid No. 2 covered the McGuire "lease" and Bid No. 3 covered the McGuire "note" (plaintiff and defendant owned no other lease and no other note); that the provisions of the bid govern that under the referred-to provisions he and not plaintiff acquired the note and mortgage in controversy. As indicated, defendant at the trial abandoned his position to the effect that there had not been a dissolution of the parties and testified to a state of facts which if believed, when considered in connection with other evidence, that the partnership was dissolved under and by virtue of the proceeding had in connection with the bid arrangement. The plaintiff's position as heretofore indicated was that the partnership had been dissolved under the bid arrangement.

The findings and judgment of the trial court are clearly sustained by the evidence. As pointed out in Bid No. 2 a (the McGuire) "lease" was referred to and there was in fact a lease from the McGuires to partners which lease was the only lease owned by plaintiff and defendant, and in Bid No. 3 a (the McGuire) note was referred to and there was in fact a McGuire note, which note was the only note owned by plaintiff and defendant. Moreover, in the partnership trial balance and in their balance sheet the (McGuire) note was listed and given a value of $10,188. We add that it tests one's credulity to believe that defendant intended to bid $9,200 for property included under Bid No. 3 if said bid did not include the McGuire note. Plaintiff only bid $2,600 for property included under said bid item. And conversely, would plaintiff only bid $4,999.99 for property included under Bid No. 2 if he believed that the McGuire note was included. According to plaintiff's testimony, the net income from the building prior to the twelve-year period expiring in 1965 would approximate $26,500. This net figure must be reduced by approximately $8,000 which represented unpaid bills incurred in constructing the building. After making said deduction we have a net figure in excess of $18,000.

We have held in a long line of cases that in an action of equitable cognizance we will review and weigh the evidence but will not reverse the trial court where its judgment is not clearly against the weight of the evidence. See cases cited under West's Okla.Dig., Appeal and Error.

Affirmed.