**YAHOLA SAND & GRAVEL COMPANY,**
a corporation, Plaintiff in Error,

v.

**Frank MARX, Defendant in Error.**

**No. 38746.**

Supreme Court of Oklahoma.

Oct. 4, 1960.

Rehearing Denied Dec. 13, 1960.

Application for Leave to File Second
Petition for Rehearing Denied
Jan. 24, 1961.

John M. Gephart, Wagoner, A. Carl Robinson, Julian B. Fite, Muskogee, for plaintiff in error.

Malcolm E. Rosser, Earl Boyd Pierce, Kelly Brown, Muskogee, for defendant in error.

WILLIAMS, Vice Chief Justice.

Many years ago Mr. Frank Marx, the defendant in error, hereinafter referred to merely as plaintiff, was in the employ of a railway corporation. He knew how to figure rates and taxes on interstate shipments.

Mr. Walter Dills was then the manager of a concern which was the predecessor of plaintiff in error, hereinafter referred to merely as defendant. Mr. Dills induced Mr. Marx to leave the railway and come with his concern, promising that when he came to retire he would be paid the same as railroad retirement would provide.

It has developed that if he had remained with the railroad until retirement, Marx could then have retired and drawn Social Security payments of approximately $155 per month and some $84 per month retirement pay and also would have been able to earn not to exceed some $1,200 per year from another employer without reduction of his benefits.

William Dills, a son of Walter, a manager for defendant and one of its vice-presidents and later president, in 1956 was going to move Mr. Marx to a different location, and Marx, a man then past 65 years of age, quit defendant's employ. Marx waited some nine days and not having heard from defendant, wrote about retirement benefits.

Dills referred Marx's letter to defendant's attorney, Mr. Fite, for answer. On August 24, 1956, Marx was advised by letter from Fite to thereafter negotiate with himself, Fite. In the letter an offer was made to pay Marx $100 per month during the pleasure of defendant as a "gift" which offer Marx rejected by letter from his attorneys dated October 4, 1956.

On February 27, 1957, another offer (to pay $80.55 per month from retirement to that time and $83.12 per month thereafter) was made. This, Marx also rejected by letter he wrote his attorneys the next day and of which they advised defendant.

Discussions between the plaintiff and his lawyers and defendant's attorney were later resumed and several written drafts of a proposed contract made.

Finally, in August 1957, Fite advised Marx and his attorneys to come to his office on a certain date to sign up a settlement contract disposing of all controversial matters pending between the parties including, but not limited to, a suit by Marx against defendant in U. S. District Court for wage and hour accruals allegedly due him, claims of Marx for unemployment compensation and his claimed right to retirement pay, as well as defendant receiving assurances from Marx of his continued loyalty to defendant in his conversation and manner.

Marx that day (Aug. 28, 1957), in Fite's office, signed three instruments: (1), a release of all his claims of any character against defendant, (2), a stipulation for dismissal with prejudice of his Federal suit against defendant above referred to and, (3), the proposed contract.

Fite, in his office on the same day, wrote, signed and delivered to Marx a letter explaining in detail the benefits Marx would receive from the proposed contract.

Thereafter Fite gave original or signed copy of the proposed contract executed by Marx to Dills. Marx had his attorneys call Fite repeatedly and himself saw Fite on the street. Fite, apparently thinking Dills would sign, kept saying he would get the money due thereunder, etc. Finally on Dec. 10, 1957, he wrote that Dills had changed his mind and decided to not go into the contract. A different offer made in the same letter and accompanied by defendant's check for $1,434.80 was also rejected by Marx.

Marx's attorney picked up from Fite's office the release, the dismissal of Federal suit (which had never been filed) and the proposed contract.

In February, 1958, the Clerk of the Federal Court sent Marx's lawyers notice of setting of their case for trial in March, 1958. They asked Fite if he would stipulate that it be dismissed. This he refused to do. Marx's lawyers themselves later had the Federal Court dismiss that case.

Marx sued defendant on the proposed contract of August 28, 1957. The trial court found the contract to have been executed, permitted an amendment during the trial and pursuant thereto rendered judgment for Marx (for the amount of $1,628.40 stated in the proposed August 28, 1957, contract to be then due Marx and $238 per month since then through December, 1958, or $4,051.10, or a total of $5,679.50).

Defendant in this appeal from that judgment first contends that there was no contract entered into between the parties; A, that Fite's acts were mere negotiations looking toward a settlement; that he had no specific or presumed authority to bind defendant; B, that Fite did not assume to effect a compromise; that he only drew

up a proposed contract not intended to become effective until signed and acknowledged by both the parties; and, C, Marx did not change his position relying upon any apparent authority in Fite and therefore no estoppel arises in favor of Marx.

Defendant also argues that there was no evidence upon which the amount awarded by the court in its judgment could be based.

In the trial court, Marx testified he asked Fite in his office on August 28, 1957, if Dills had read and approved the (proposed August 28, 1957) contract and that Fite gave him an affirmative answer; that he, Marx, would not have signed without such assurance. However, Marx admitted, "Well, it should be in writing. I hope to have it in writing."

Such proposed contract recited that it was between Yahola Sand & Gravel Co., party of the first part, and Frank Marx, party of the second part, and provided a place for defendant to sign by its president and for attest by its secretary and for both defendant and Marx to acknowledge it. Both of Marx's attorneys testified the intentions of the parties were that it be signed by both.

Both Fite and Dills testified that Dills specifically gave Fite authority to make the offer of August 24, 1956, that of February 27, 1957, and that of December 10, 1957, and only these three. Dills testified he at no time authorized a renewal of the February 27, 1957, offer which Marx had rejected. Fite testified he did not say Dills had read and approved the contract; that he had just finished the final proposed draft a day or two preceding; that Dills had been and was then out of town and would not return until after Labor Day; that Fite said Dills would sign the agreement; that he had worked along with plaintiff's lawyers and they were getting so close to an agreement and the August 28, 1957 proposed contract was so little different from the February, 1957 proposed contract (rejected by Marx) that he, Fite, sincerely believed it would be signed by Dills.

Our statutes provide that a contract is an agreement to do or not to do a certain thing (15 O.S.1951 § 1), and that it is essential to the existence of a contract that there should be: 1. Parties capable of contracting; 2. their consent; 3. a lawful object; and, 4. sufficient cause or consideration (15 O.S.1951 § 2). There was no consent on behalf of defendant by Dills, either signed or vocal.

However, by amended answer, the defendant admitted that "under date of February 27, 1957, pursuant to authority granted to him by the defendant, Julian B. Fite, employed by the defendant to defend it in said cause in the Federal Court, by letter made an offer to the plaintiff to settle such cause and all other existing controversies on the terms set forth in such letter."

In such amended answer defendant specifically denied "that, other than such offer of February 27, 1957, which was refused and was withdrawn, any authority was ever granted to Julian B. Fite to make any settlement with the plaintiff of the controversy existing between the plaintiff and the defendant. No authority was ever granted to Julian B. Fite to renew the offer of February 27th, after it was refused and withdrawn, nor was Julian B. Fite ever authorized to make any new offer or to accept any offer made by the plaintiff." This amended answer was sworn to by William Dills before a Notary Public.

Then, as above related, both Dills and Fite testified that Fite was authorized to make an offer preceding the February 27, 1957 offer (that of August 24, 1956) and an offer following such February 27, 1957 offer (that of December 10, 1957).

In brief of defendant it is stated that:

"The offer once made by Yahola in the letter of February 27, 1957 was refused and withdrawn. Perhaps at that point Mr. Fite should have desisted from any further activities. However, he thought the matter could be compromised and continued negotiations. Mr. Dills was aware that negotiations

were continuing, but there is nothing to show that he was aware of the content of any proposed agreements until he was presented with contract draft of August 28, 1957, which he declined to execute on behalf of Yahola."

Defendant argues under Proposition I, A, that an attorney has no implied power in such capacity to compromise his client's claim or cause of action, citing 30 A.L.R.2d 945; Turner v. Fleming, 37 Okl. 75, 130 P. 551, 45 L.R.A.,N.S., 265; Scott v. Moore, 52 Okl. 200, 152 P. 823, 824; Hamberger v. White, 54 Okl. 736, 154 P. 576; First State Bank of Indiahoma v. Carr, 72 Okl. 262, 180 P. 856, 858; Vinson v. Davis, 76 Okl. 43, 183 P. 902; McDonald v. Strawn, 78 Okl. 271, 190 P. 558 and certain cases from this and other jurisdictions referred to in the annotation first above referred to.

Defendant under its proposition I, B, argues:

"Under the circumstances, that is, that an offer had once been made by Yahola to Marx, Marx had refused and that offer was then withdrawn, an assent by Marx to terms much like but varying from such withdrawn offer amounts to a new offer by Marx."

citing Niles v. Hancock, 140 Cal. 157, 73 P. 840; Nabob Oil Co. v. Bay State Oil & Gas Co., 208 Okl. 296, 255 P.2d 513; that an instrument finally concluding the negotiations between the parties and apparently contemplated by the parties to require signatures of the parties is not a contract until signed, citing Mississippi and Dominion Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063; Western Roofing Tile Co. v. Jones, 26 Okl. 209, 109 P. 225; Fry v. Foster, 179 Okl. 398, 65 P.2d 1224, and Simmons and Simmons Const. Co. v. Rea, 155 Tex. 353, 286 S.W.2d 415.

Under Proposition I, C, defendant argues that if Marx by pleading estoppel meant estoppel by contract, the question has been answered by defendant's foregoing argu-

ment and if he meant equitable estoppel that he has suffered no detriment, in that the stipulation for dismissal of his Federal suit was not filed but that his attorneys voluntarily dismissed that action on their unilateral motion and "without prejudice," citing Burns v. McCain, 107 Cal.App. 291, 290 P. 623; Rosen v. Martin, 102 Okl. 65, 226 P. 577 and Cuneo v. Champlin Refining Co., 178 Okl. 198, 62 P.2d 82.

Assuming for the purposes of discussion, without so determining, that all the subdivisions of defendant's first proposition are correct, still plaintiff in amended petition had pleaded:

"Plaintiff further states that said contract and release were delivered to said agent· and attorney for said defendant and that on the date of said delivery of said instruments, to-wit, August 28, 1957, said agent and attorney for said defendant, Yahola Sand & Gravel Co., wrote plaintiff a letter in which he stated that the contract was effective as of January 1, 1957; and said letter further stated the amount due plaintiff at that time pursuant to the terms of the contract. A copy of said letter is hereto attached, marked Exhibit 'C', and made a part hereof."

The letter, Exhibit "C" so referred to and incorporated into said pleading was the letter from Fite written to Marx on the date of the signing of the alleged contract sued upon herein. It was introduced in evidence and is further discussed hereinafter.

The trial court, in its judgment, found "* * * all issues in favor of the plaintiff and that plaintiff should have judgment against the defendant as prayed; and the Court specifically finds that the contract attached to plaintiff's petition and introduced in evidence herein, dated the 28th day of August, 1957, should be carried out in full as to all of its terms."

Defendant argues "There is no evidence of any sort that anyone acting for Yahola

ever ratified any agreement made by Mr. Fite—if in fact he ever made any. The only testimony in the case is that the authorities of Yahola refused to assent to the proposed arrangement, and declined to sign the proposed contract." and yet in brief defendant further says:

"That Yahola, despite Mr. Dills' statement 'Then we won't pay him a damn thing,' made when Marx refused to negotiate concerning the earlier offer, was still ready to make some kind of a settlement with him, is inherent in this whole controversy; in fact, it is still willing, but not on Mr. Marx' terms.

"As matters stood when Mr. Fite, with suggestions and amendments by Mr. Rosser and Mr. Pierce, embarked upon the problem of drafting a contract with terms acceptable to Mr. Marx, just what kind of a settlement should be entered into was quite nebulous."

Yet Fite knew Marx was entitled in law to receive something from defendant Yahola. In letter of October 4, 1956, from Marx' lawyers to Fite, they advised Fite as follows: " * * * From his statement of the facts it is plain that he is entitled to a binding contract by which he will receive a substantial sum sent in monthly payments or a lump sum, or he is not entitled to anything at all * * *. If Yahola is disposed to offer a real binding settlement let us know and we will have our client meet yours * * *."

In letter of April 12, 1957, Fite, referring to the Federal Wage and Hour suit, wrote Marx' lawyers, " * * * I have no doubt that Mr. Marx will prevail to some degree in this pending case * * *."

---

It is to be noted that under the Fite offer of Feb. 27, 1957, admittedly authorized by Dills, for the period 8–1–56 through 2–28–57, Marx would receive $184 per month less $103.45 social security benefits, or $80.55;

For the period 3–1–57 and on he would receive (during the lifetime of his wife and himself) $238.30 each month less Social Security he should be entitled to ($155.18 per month) whether applied for or not (except no deduction therefor if not eligible to receive same) or $83.12 per month; if Mrs. Marx should predecease Mr. Marx his payment would be reduced to $184 per month less $103.45 per month Social Security or $80.55; in case Marx died first his widow would receive $54.30 per month less any Social Security benefits to which she would be entitled. If during the time Marx was to receive $238.30 per month less $155.18 Social Security he would be ineligible for such Social Security, the offer recited, only in case he became employed and earned more than $1,200 per year, in which event one month's pay-

It is to be noted that under the Aug. 28, 1957 contract and Fite letter for the period 8–1–56 through 12–31–56 Marx would receive $422 or $84.40 per month; for the months of January, February and March, 1957, he would receive $253.-20 or $84.40 per month (he having drawn social security).

For the period April, May, June and July, 1957, Marx, not having drawn Social Security, would receive $238.30; for each of said months, or $933.20; for the period July 1, 1957, and on he would receive $84.40 each month for the rest of his natural life, and any sums withheld from him by or required of him to be repaid to the Social Security Administration by virtue of his having earned more than $1,200 (or other amount of earnings permitted without deduction of Social benefits); further, if at any time during any calendar year while contract was in effect (prior to Marx becoming 72 years of age or earlier age when no penalties should be assessed by Social Security Administration for earning more than $1,200 or other amount per-

ment would be taken off for each $80 earned during the year in excess of $1,-200, until age 72 after which no such penalties would be deducted.

mitted by it without deduction from Social Security payments) Marx by statement from his employer should show Yahola that he had earned more than $1,200 and by statement from the local authorities of Social Security Administration should show to Yahola that he had not drawn any Social Security payments for any month during the year when he had earned more than $80, Yahola would pay Marx for the succeeding month $238.30; and each succeeding month, upon a statement by Frank Marx' employer showing he had earned more than $80 and a statement from the Social Security Administration that he had not drawn any social security payment for the current month Yahola would pay to Frank Marx for the succeeding month the sum of $238.-30, "and so on each month until the end of the calendar year."

------◆------

We believe this comparison of the terms of these respective instruments would have warranted the trial court in inferring that Dills, along with Fite, might well have believed there was little, if any, substantial difference in the Feb. 27, 1957 offer and the alleged Aug. 28, 1957, contract.

In the letter of December 10, 1957, Fite with the admitted authority of Dills to make the offer, wrote Marx' lawyer an offer of $84.40 per month, including payment of $1,434.80 already accumulated at that rate and then, admitting defendant's reason for withdrawal of prior offers and perhaps some liability to Marx, stated "Yahola Sand & Gravel Company is willing to see that Mr. Marx' income, should he be unemployed, or only employed in a minor fashion, will be kept up to the amount which he would have received under such circumstances had he continued railroad employment. On the other hand, it does not care to allow him, while waiving Social Security benefits which have been provided

for him, to engage in a lucrative occupation in the future at its expense.

"Since claims have been made and since one suit has been filed, you will readily recognize that this proposed contract will be upon consideration, and, therefore, binding, regardless of what Yahola may think of the validity of the claims made and the suit filed."

Mr. William Dills testified he received the proposed contract of August 28, 1957, a short time after that date and carried it with him for quite a while, finally decided that defendant would not accept it and authorized the December 10, 1957 offer.

While defendant did not file the stipulation for dismissal of the Federal case, we believe the trial court would have been warranted in inferring that Marx, upon being repeatedly reassured by Fite that Dills would sign the contract, believed such written stipulation would be filed and that his release of all claims would be relied upon by defendant and that Marx was lulled

along by conduct of defendant's officer, Dills, from August 10, 1956, to December 10, 1957.

■ In Yarnall v. Yorkshire Worsted Mills, 370 Pa. 93, 87 A.2d 192, 193, 30 A.L.R.2d 939, 941, the court used language we deem applicable here. The court there said:

"A client ratifies his attorney's act if he does not repudiate it promptly upon receiving knowledge that the attorney has exceeded his authority. In Baumgartner v. Whinney, 156 Pa.Super. 167, 171, 39 A.2d 738, 740, that court said, 'True, an attorney has no power, in the absence of express authority, to compromise or settle his client's claim. North Whitehall Township v. Keller, 100 Pa. 105. But a client may ratify his attorney's acts; and "an affirmance of an unauthorized transaction may be inferred from a failure to repudiate it": Restatement, Agency, § 94. Indeed, a client makes his attorney's act his own if he does not disavow it the first moment he receives knowledge that his attorney has transcended his authority. Bredin v. Dubarry, 14 Serg. & R. 27; Filby v. Miller, 25 Pa. 264; Andersen Coal M. Co. v. Sloan, Howell & Co., 46 Pa. Super. 320; Smuckler v. Di Napoli, 62 Pa.Super. 570.' Here there is no allegation of any repudiation of the stipulation until twenty months after appellant was acquainted with its content.

"In addition to his failure to repudiate, appellant accepted the benefits of the settlement with full knowledge of its terms. It is a fundamental principle of the law of agency that such action is an election to ratify the unauthorized act and that by such election the principal is bound. Neel v. Crittenden, 353 Pa. 201, 204, 205, 44 A.2d 558; Blumberg v. Broad Street Trust Company, 329 Pa. 471, 198 A. 27; Presbyterian Board v. Gilbee, 212 Pa. 310, 314,

61 A. 925, 926, where this Court said, 'It is repugnant to every sense of justice and fair dealing that a principal shall avail himself of the benefits of an agent's act and at the same time repudiate his authority'; Restatement, Agency, Sections 98, 99; cf. Gum v. Felton, 341 Pa. 96, 17 A.2d 386."

Defendant would have us distinguish that case from the present one because the client there received and for 20 months retained $5,000 under the settlement he claimed his attorney had no authority to make. Here Dills "dilly-dallied" at least 16 months and then with his offer of Dec. 10, 1957 (a counter-offer he seems to think) he sent along a signed check of that date in the amount of $1,434.80, as part of defendant's "gesture of good will towards Mr. Marx, as a long time employee."

■ We decline to follow the reasoning of defendant in this regard. We do not find the judgment of the trial court to be clearly against the weight of the evidence. Buck v. Caldwell, Okl., 340 P.2d 485.

■ Defendant, for its second proposition, argues that, "If there was a contract, there was no evidence upon which the amount awarded by the court could be based, and the judgment rendered is erroneous."

Plaintiff introduced in evidence statements from an official of the Social Security Administration dated at Muskogee to the effect that their records indicated that Marx "suspended" his Social Security payments because of his work in April, 1957 and that they remained suspended at his request during the balance of 1957, and from January 1, 1958, through December 1, 1958, and were still suspended (January 20, 1959) and would remain so until further notice from Marx.

Marx also introduced in evidence a statement from his then employer, dated January 20, 1959, to the effect that Marx had been in their employ since the latter part of

March, 1957, and that for the period from August, 1957, to December, 1958, inclusive, he had earned and been paid by such employer, more than $80 per month for each of such months.

Moreover, plaintiff in testimony given Feb. 4, 1959, stated that he had worked for his then employer since March 31, 1957, and that his monthly earnings from such employer had exceeded $84.40 per month since that time, and that he had received no income from either railroad retirement or Social Security. He further testified, according to his computations, to the exact amounts determined by the trial court to be due him.

By the contract, liability of defendant to plaintiff for the period of time including through July, 1957, was admitted. By the above proof, same for the balance of the period covered in that portion of the trial court's judgment fixing plaintiff's recovery through the month of December, 1958, was shown.

The judgment of the trial court is affirmed.

It appearing that the judgment of the trial court was superseded by a bond executed by the defendant as principal and by United States Fidelity & Guaranty Company, a corporation, as surety thereon, and that the terms of said bond have become fixed and obligatory by this opinion of this court, ordered that plaintiff (defendant in error) have judgment against said surety for the sum of $5,679.50, together with interest thereon at the rate of six per cent per annum from August 28, 1957, and for all costs in the trial court accrued and accruing, and herein. Upon the failure of the plaintiff in error to pay said judgment, let execution issue from the trial court after due receipt of the mandate.

JOHNSON, BLACKBIRD, IRWIN and BERRY, JJ., concur.

WELCH and JACKSON, JJ., dissent.